(Slip Opinion)  OCTOBER TERM, 2017  1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ANIMAL SCIENCE PRODUCTS, INC., ET AL. *v*. HEBEI WELCOME PHARMACEUTICAL CO. LTD. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 16–1220.   Argued April 24, 2018—Decided June 14, 2018

Petitioners, U. S.-based purchasers of vitamin C (U. S. purchasers), filed a class-action suit, alleging that four Chinese corporations that manufacture and export the nutrient (Chinese sellers), including the two respondents here, had agreed to fix the price and quantity of vitamin C exported to the United States, in violation of §1 of the Sherman Act. The Chinese sellers moved to dismiss the complaint on the ground that Chinese law required them to fix the price and quantity of vitamin C exports, thus shielding them from liability under U. S. antitrust law. The Ministry of Commerce of the People's Republic of China (Ministry) filed an *amicus* brief in support of the motion, explaining that it is the administrative authority authorized to regulate foreign trade, and stating that the alleged conspiracy in restraint of trade was actually a pricing regime mandated by the Chinese Government. The U. S. purchasers countered that the Ministry had identified no law or regulation ordering the Chinese sellers' price agreement, highlighted a publication announcing that the Chinese sellers had agreed to control the quantity and rate of exports without government intervention, and presented supporting expert testimony.

The District Court denied the Chinese sellers' motion in relevant part, concluding that it did not regard the Ministry's statements as "conclusive," particularly in light of the U. S. purchasers' evidence. When the Chinese sellers subsequently moved for summary judgment, the Ministry submitted another statement, reiterating its stance, and the U. S. purchasers pointed to China's statement to the World Trade Organization that it ended its export administration of vitamin C in 2002. The court denied this motion as well. The case

was then tried to a jury, which returned a verdict for the U. S. pur-
chasers.

The Second Circuit reversed, holding that the District Court erred
by denying the Chinese sellers' motion to dismiss the complaint.
When a foreign government whose law is in contention submits an of-
ficial statement on the meaning and interpretation of its domestic
law, the court concluded, federal courts are "bound to defer" to the
foreign government's construction of its own law, whenever that con-
struction is "reasonable." Inspecting only the Ministry's brief and the
sources cited therein, the court found the Ministry's account of Chi-
nese law "reasonable."

*Held*: A federal court determining foreign law under Federal Rule of
Civil Procedure 44.1 should accord respectful consideration to a for-
eign government's submission, but the court is not bound to accord
conclusive effect to the foreign government's statements.

Rule 44.1 fundamentally changed the mode of determining foreign
law in federal courts. Before adoption of the rule in 1966, a foreign
nation's laws had to be "proved as facts." *Talbot* v. *Seeman*, 1 Cranch
1, 38. Rule 44.1, in contrast, specifies that a court's determination of
foreign law "must be treated as a ruling on a question of law." And in
ascertaining foreign law, courts are not limited to materials submit-
ted by the parties, but "may consider any relevant material or
source." Appellate review, as is true of domestic law determinations,
is *de novo*. The purpose of these changes was to align, to the extent
possible, the process for determining alien law and the process for de-
termining domestic law.

Neither Rule 44.1 nor any other rule or statute addresses the
weight a federal court determining foreign law should give to the
views presented by a foreign government. In the spirit of "interna-
tional comity," *Société Nationale Industrielle Aérospatiale* v. *United
States Dist. Court for Southern Dist. of Iowa*, 482 U. S. 522, 543, and
n. 27, a federal court should carefully consider a foreign state's views
about the meaning of its own laws. The appropriate weight in each
case, however, will depend upon the circumstances; a federal court is
neither bound to adopt the foreign government's characterization nor
required to ignore other relevant materials. No single formula or
rule will fit all cases, but relevant considerations include the state-
ment's clarity, thoroughness, and support; its context and purpose;
the transparency of the foreign legal system; the role and authority of
the entity or official offering the statement; and the statement's con-
sistency with the foreign government's past positions.

Judged in this light, the Second Circuit's unyielding rule is incon-
sistent with Rule 44.1 and, tellingly, with this Court's treatment of
analogous submissions from States of the United States. If the rele-

Syllabus

vant state law is established by a decision of "the State's highest court," that decision is "binding on the federal courts," *Wainwright* v. *Goode*, 464 U. S. 78, 84, but views of the State's attorney general, while attracting "respectful consideration," do not garner controlling weight, *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 76– 77, n. 30. Furthermore, because the Second Circuit riveted its attention on the Ministry's submission, it did not address evidence submitted by the U. S. purchasers. The court also misperceived the pre-Rule 44.1 decision of *United States* v. *Pink*, 315 U. S. 203. Under the particular circumstances of that case, this Court found conclusive a declaration from the government of the Russian Socialist Federal Soviet Republic on the extraterritorial effect of a decree nationalizing assets: The declaration was *obtained by the United States* through official "diplomatic channels," *id.,* at 218; there was no indication that the declaration was inconsistent with the Russian Government's past statements; and the declaration was consistent with expert evidence in point.

The Second Circuit expressed concern about reciprocity, but the United States has not historically argued that foreign courts are *bound* to accept its characterizations or precluded from considering other relevant sources. International practice is also inconsistent with the Second Circuit's rigid rule. Pp. 7–12.

837 F. 3d 175, vacated and remanded.

GINSBURG, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 16–1220

_____

## ANIMAL SCIENCE PRODUCTS, INC., ET AL., PETITIONERS *v.* HEBEI WELCOME PHARMACEUTICAL CO. LTD., ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 14, 2018]

JUSTICE GINSBURG delivered the opinion of the Court.

When foreign law is relevant to a case instituted in a federal court, and the foreign government whose law is in contention submits an official statement on the meaning and interpretation of its domestic law, may the federal court look beyond that official statement? The Court of Appeals for the Second Circuit answered generally "no," ruling that federal courts are "bound to defer" to a foreign government's construction of its own law, whenever that construction is "reasonable." *In re Vitamin C Antitrust Litigation*, 837 F. 3d 175, 189 (2016).

We hold otherwise. A federal court should accord respectful consideration to a foreign government's submission, but is not bound to accord conclusive effect to the foreign government's statements. Instead, Federal Rule of Civil Procedure 44.1 instructs that, in determining foreign law, "the court may consider any relevant material or source . . . whether or not submitted by a party." As "[t]he court's determination must be treated as a ruling on a question of law," Fed. Rule Civ. Proc. 44.1, the court "may

engage in its own research and consider any relevant material thus found," Advisory Committee's 1966 Note on Fed. Rule Civ. Proc. 44.1, 28 U. S. C. App., p. 892 (hereinafter Advisory Committee's Note). Because the Second Circuit ordered dismissal of this case on the ground that the foreign government's statements could not be gainsaid, we vacate that court's judgment and remand the case for further consideration.

I

Petitioners, U. S.-based purchasers of vitamin C (hereinafter U. S. purchasers), filed a class-action suit against four Chinese corporations that manufacture and export the nutrient (hereinafter Chinese sellers). The U. S. purchasers alleged that the Chinese sellers, two of whom are respondents here, had agreed to fix the price and quantity of vitamin C exported to the United States from China, in violation of §1 of the Sherman Act, 15 U. S. C. §1. More particularly, the U. S. purchasers stated that the Chinese sellers had formed a cartel "facilitated by the efforts of their trade association," the Chamber of Commerce of Medicines and Health Products Importers and Exporters (Chamber). Complaint in No. 1:05–CV–453, Docket No. 1, ¶43. The Judicial Panel on Multidistrict Litigation consolidated the instant case and related suits for pretrial proceedings in the United States District Court for the Eastern District of New York.

The Chinese sellers moved to dismiss the U. S. purchasers' complaint on the ground that Chinese law required them to fix the price and quantity of vitamin C exports. Therefore, the Chinese sellers urged, they are shielded from liability under U. S. antitrust law by the act of state doctrine, the foreign sovereign compulsion doctrine, and principles of international comity. The Ministry of Commerce of the People's Republic of China (Ministry) filed a brief as *amicus curiae* in support of the Chinese sellers'

motion.  The Ministry's brief stated that the Ministry is "the highest administrative authority in China authorized to regulate foreign trade," App. to Pet. for Cert. 190a; that the Chamber is "an entity under the Ministry's direct and active supervision" and is authorized to regulate vitamin C exports, *id.,* at 196a; and that the conspiracy in restraint of trade alleged by the U. S. purchasers was in fact "a regulatory pricing regime mandated by the government of China," *id.,* at 197a.[1]

In response, the U. S. purchasers disputed that Chinese law required the Chinese sellers to engage in price fixing. Among other things, the U. S. purchasers noted that the Ministry had not identified any written law or regulation

———————————

[1] The Ministry told the District Court: For much of the 20th century, China allowed only state-owned entities to export products.  App. to Pet. for Cert. 198a.  When China started to allow private enterprises to obtain export licenses, the Ministry established the Chamber to regulate exports under the Ministry's authority and direction.  *Ibid.*

In 1997, the Ministry authorized the establishment of the Chamber's Vitamin C Subcommittee.  *Id.,* at 202a.  That year, the Ministry promulgated a regulation authorizing and requiring the subcommittee to limit the production of vitamin C for export and to set export prices. *Id.,* at 202a–204a.  Under the regulation delineating this "Export Licensing System," the Ministry issued export licenses only to manufacturers whose export volume and price complied with the output quota and price coordinated by the Vitamin C Subcommittee.  *Id.,* at 204a.

In 2002, the Ministry replaced the Export Licensing System with a "Verification and Chop System."  *Id.,* at 208a.  As set forth in a 2002 Ministry Notice, the Chamber itself—instead of the Ministry—would inspect each export contract and certify its compliance with the coordinated quotas and price by affixing a special seal, known as a "chop." *Id.,* at 208a–209a.  China's Customs would allow export only if the exporter presented its contract bearing the Chamber's "chop."  *Id.,* at 209a.  According to the Ministry, it was implicit in this arrangement that vitamin C exporters would remain under an obligation to fix prices and volumes.  *Id.,* at 208a.

The effect of China's regime on the Chinese sellers' liability under the Sherman Act, we note, is not an issue before the Court today.

expressly ordering the Chinese sellers' price agreement.[2]
They also highlighted a Chamber announcement that the
manufacturers "were able to reach a self-regulated agree-
ment . . . whereby they would voluntarily control the
quantity and pace of exports . . . without any government
intervention." App. 109.  In addition, the U. S. purchasers
presented expert testimony that the Chinese Govern-
ment's authorization of a Vitamin C Subcommittee within
the Chamber did not necessarily mean that the subcom-
mittee's price fixing was mandated by law.

The District Court denied the Chinese sellers' motion to
dismiss the complaint in relevant part.  *In re Vitamin C
Antitrust Litigation*, 584 F. Supp. 2d 546, 559 (EDNY
2008).  That court acknowledged that the Ministry's *ami-
cus* brief was "entitled to substantial deference."  *Id.,* at
557.  The court, however, did not regard the Ministry's
statements as "conclusive," emphasizing particularly that
the U. S. purchasers had submitted evidence suggesting
that the price fixing was voluntary.  *Ibid.*  The record, the
District Court determined, was "too ambiguous to foreclose
further inquiry into the voluntariness of [the Chinese
sellers'] actions."  *Id.,* at 559.

After further discovery, focused on whether Chinese law
compelled the Chinese sellers to enter into a price-fixing
agreement, the Chinese sellers moved for summary judg-
ment.  See *In re Vitamin C Antitrust Litigation*, 810
F. Supp. 2d 522, 525–526 (EDNY 2011).  The Ministry

——————

[2] The complaint, the U. S. purchasers emphasized, was directed only
at conduct occurring after December 2001.  As they understood the
Ministry's 2002 Notice, see *supra,* at 3, n. 1, vitamin C exporters could
have lawfully opted out of price fixing.  Beyond that, the Vitamin C
Subcommittee had replaced its 1997 Charter with a new 2002 Charter,
App. 182–197, which eliminated the 1997 Charter's requirement that
subcommittee members "[s]trictly execute" the "coordinated price" set
by the Chamber, compare *id.*, at 85, with *id.,* at 185, and granted
members an express "[r]igh[t]" to "freely resign from the Subcommit-
tee," *id.,* at 186.

submitted an additional statement, reiterating that "the Ministry specifically charged the Chamber . . . with the authority and responsibility . . . for regulating, through consultation, the price of vitamin C manufactured for export." App. 133. The Chinese sellers tendered expert testimony in accord with the Ministry's account, which stressed that the Ministry's "interpretation of its own regulations and policies carries decisive weight under Chinese law." *Id.,* at 142. The U. S. purchasers, in response, cited further materials supporting their opposing view, including China's statement to the World Trade Organization (WTO) that it "gave up export administration of . . . vitamin C" in 2002. 810 F. Supp. 2d, at 532 (internal quotation marks omitted). Denying the Chinese sellers' motion for summary judgment, the District Court held that Chinese law did not require the sellers to fix the price or quantity of vitamin C exports. *Id.,* at 525.

The case was then tried to a jury, which returned a verdict for the U. S. purchasers. The jury found that the Chinese sellers had agreed to fix the prices and quantities of vitamin C exports, see App. to Pet. for Cert. 276a–279a, and further found that the Chinese sellers were not "actually compelled" by China to enter into those agreements, *id.,* at 278a. In accord with the jury's verdict, the District Court entered judgment for the U. S. purchasers, awarding some $147 million in treble damages and enjoining the Chinese sellers from further violations of the Sherman Act.

The Court of Appeals for the Second Circuit reversed, holding that the District Court erred in denying the Chinese sellers' motion to dismiss the complaint. *In re Vitamin C Antitrust Litigation*, 837 F. 3d 175, 178, 195–196 (2016). The Court of Appeals determined that the propriety of dismissal hinged on whether the Chinese sellers could adhere to both Chinese law and U. S. antitrust law. See *id.,* at 186. That question, in turn, depended on "the

amount of deference" owed to the Ministry's characteriza-
tion of Chinese law. *Ibid.* Cognizant of "competing au-
thority" on this question, *ibid.,* the Court of Appeals set-
tled on a highly deferential rule: "[W]hen a foreign
government, acting through counsel or otherwise, directly
participates in U. S. court proceedings by providing a
[statement] regarding the construction and effect of [the
foreign government's] laws and regulations, which is
reasonable under the circumstances presented, a U. S.
court is bound to defer to those statements," *id.,* at 189.
The appeals court "note[d] that[,] if the Chinese Govern-
ment had not appeared in this litigation, the [D]istrict
[C]ourt's careful and thorough treatment of the evidence
before it in analyzing what Chinese law required at both
the motion to dismiss and summary judgment stages
would have been entirely appropriate." *Id.,* at 191, n. 10.

Applying its highly deferential rule, the Court of Ap-
peals concluded that the Ministry's account of Chinese law
was "reasonable." In so concluding, the Court of Appeals
inspected only the Ministry's brief and sources cited therein.
*Id.,* at 189–190. Because it thought that "a U. S. court
[must] not embark on a challenge to a foreign govern-
ment's official representation," *id.,* at 189, the Court of
Appeals disregarded the submissions made by the U. S.
purchasers casting doubt on the Ministry's account of
Chinese law, *id.,* at 189–190. Based solely on the Minis-
try's statements, the Court of Appeals held that "Chinese
law required [the Chinese sellers] to engage in activities in
China that constituted antitrust violations here in the
United States." *Ibid.*

We granted certiorari to resolve a Circuit conflict over
this question: Is a federal court determining foreign law
under Rule 44.1 required to treat as conclusive a submis-
sion from the foreign government describing its own law?

583 U. S. \_\_\_ (2018).[3]

## II

At common law, the content of foreign law relevant to a dispute was treated "as a question of fact." Miller, Federal Rule 44.1 and the "Fact" Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine, 65 Mich. L. Rev. 613, 617–619 (1967) (Miller). In 1801, this Court endorsed the common-law rule, instructing that "the laws of a foreign nation" must be "proved as facts." *Talbot* v. *Seeman*, 1 Cranch 1, 38 (1801); see, *e.g., Church* v. *Hubbart*, 2 Cranch 187, 236 (1804) ("Foreign laws are well understood to be facts."). Ranking questions of foreign law as questions of fact, however, "had a number of undesirable practical consequences." 9A C. Wright & A. Miller, Federal Practice and Procedure §2441, p. 324 (3d ed. 2008) (Wright & Miller). Foreign law "had to be raised in the pleadings" and proved "in accordance with the rules of evidence." *Ibid.* Appellate review was deferential and limited to the record made in the trial court. *Ibid.*; see also Miller 623.

Federal Rule of Civil Procedure 44.1, adopted in 1966, fundamentally changed the mode of determining foreign law in federal courts. The Rule specifies that a court's

––––––––––

[3] Compare *In re Vitamin C Antitrust Litigation*, 837 F. 3d 175 (CA2 2016) (case below), with *In re Oil Spill by Amoco Cadiz*, 954 F. 2d 1279, 1311–1313 (CA7 1992) (adopting French Government's interpretation of French law, but only after considering all of the circumstances, including the French Government's statements in other contexts); *United States* v. *McNab*, 331 F. 3d 1228, 1239–1242 (CA11 2003) (noting Honduran Government's shift in position on the question of Honduran law and determining that the original position stated the proper interpretation); *McKesson HBOC, Inc.* v. *Islamic Republic of Iran*, 271 F. 3d 1101, 1108–1109 (CADC 2001), vacated in part on other grounds, 320 F. 3d 280 (CADC 2003) (declining to adopt the view of Iranian law advanced by Iranian Government because it was not supported by the affidavits submitted by Iran's experts).

determination of foreign law "must be treated as a ruling on a question of law," rather than as a finding of fact.[4] Correspondingly, in ascertaining foreign law, courts are not limited to materials submitted by the parties; instead, they "may consider any relevant material or source . . . , whether or not . . . admissible under the Federal Rules of Evidence." *Ibid.* Appellate review, as is true of domestic law determinations, is *de novo.* Advisory Committee's Note, at 892. Rule 44.1 frees courts "to reexamine and amplify material . . . presented by counsel in partisan fashion or in insufficient detail." *Ibid.* The "obvious" purpose of the changes Rule 44.1 ordered was "to make the process of determining alien law identical with the method of ascertaining domestic law to the extent that it is possible to do so." Wright & Miller §2444, at 338–342.

Federal courts deciding questions of foreign law under Rule 44.1 are sometimes provided with the views of the relevant foreign government, as they were in this case through the *amicus* brief of the Ministry. See *supra,* at 2–3. As the Court of Appeals correctly observed, Rule 44.1 does not address the weight a federal court determining foreign law should give to the views presented by the foreign government. See 837 F. 3d, at 187. Nor does any other rule or statute. In the spirit of "international comity," *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for Southern Dist. of Iowa,* 482 U. S. 522, 543, and n. 27 (1987), a federal court should carefully consider a foreign state's views about the meaning of its own laws. See *United States* v. *McNab,* 331 F. 3d 1228, 1241 (CA11 2003); cf. *Bodum USA, Inc.* v. *La Cafetière, Inc.,* 621 F. 3d 624, 638–639 (CA7 2010) (Wood, J., concurring). But the appropriate weight in each case will depend

————————

[4] Federal Rule of Criminal Procedure 26.1 establishes "substantially the same" rule for criminal cases. Advisory Committee's 1966 Note on Fed. Rule Crim. Proc. 26.1, 18 U. S. C. App., p. 709.

upon the circumstances; a federal court is neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials. When a foreign government makes conflicting statements, see *supra,* at 5, or, as here, offers an account in the context of litigation, there may be cause for caution in evaluating the foreign government's submission.

Given the world's many and diverse legal systems, and the range of circumstances in which a foreign government's views may be presented, no single formula or rule will fit all cases in which a foreign government describes its own law. Relevant considerations include the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions.

Judged in this light, the Court of Appeals erred in deeming the Ministry's submission binding, so long as facially reasonable. That unyielding rule is inconsistent with Rule 44.1 (determination of an issue of foreign law "must be treated as a ruling on a question of law"; court may consider "any relevant material or source") and, tellingly, with this Court's treatment of analogous submissions from States of the United States. If the relevant state law is established by a decision of "the State's highest court," that decision is "binding on the federal courts." *Wainwright* v. *Goode*, 464 U. S. 78, 84 (1983) (*per curiam*); see *Mullaney* v. *Wilbur*, 421 U. S. 684, 691 (1975). But views of the State's attorney general, while attracting "respectful consideration," do not garner controlling weight. *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 76–77, n. 30 (1997); see, *e.g., Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 393–396 (1988). Furthermore, because the Court of Appeals riveted its attention on the Ministry's submission, it did not address other evidence,

including, for example, China's statement to the WTO that
China had "g[i]ve[n] up export administration . . . of vita-
min C" at the end of 2001. 810 F. Supp. 2d, at 532 (inter-
nal quotation marks omitted).[5]

The Court of Appeals also misperceived this Court's
decision in *United States* v. *Pink*, 315 U. S. 203 (1942).
See 837 F. 3d, at 186–187, 189. *Pink*, properly compre-
hended, is not compelling authority for the attribution of
controlling weight to the Ministry's brief. We note, first,
that *Pink* was a pre-Rule 44.1 decision. Second, *Pink*
arose in unusual circumstances. *Pink* was an action
brought by the United States to recover assets of the U. S.
branch of a Russian insurance company that had been
nationalized in 1918, after the Russian revolution. 315
U. S., at 210–211. In 1933, the Soviet Government as-
signed the nationalized assets located in this country to
the United States. *Id.,* at 211–212. The disposition of the
case turned on the extraterritorial effect of the nationali-
zation decree—specifically, whether the decree reached
assets of the Russian insurance company located in the
United States, or was instead limited to property in Rus-
sia. *Id.,* at 213–215, 217. To support the position that the
decree reached all of the company's assets, the United
States obtained an "official declaration of the Commissar-
iat for Justice" of the Russian Socialist Federal Soviet
Republic. *Id.,* at 218. The declaration certified that the
nationalization decree reached "the funds and property of
former insurance companies . . . irrespective of whether
[they were] situated within the territorial limits of [Rus-

————————

[5]The Court of Appeals additionally mischaracterized the Ministry's
brief as a "sworn evidentiary proffer." 837 F. 3d, at 189. In so describ-
ing the Ministry's submission, the Court of Appeals overlooked that a
court's resolution of an issue of foreign law "must be treated as a ruling
on a question of law." Fed. Rule Civ. Proc. 44.1. The Ministry's brief,
while a probative source for resolving the legal question at hand, was
not an attestation to facts.

sia] or abroad." *Id.,* at 220 (internal quotation marks omitted). This Court determined that "the evidence supported [a] finding" that "the Commissariat for Justice ha[d] power to interpret existing Russian law." *Ibid.* "That being true," the Court concluded, the "official declaration [wa]s conclusive so far as the intended extraterritorial effect of the Russian decree [wa]s concerned." *Ibid.*

This Court's treatment of the Commissariat's submission as conclusive rested on a document *obtained by the United States,* through official "diplomatic channels." *Id.,* at 218. There was no indication that the declaration was inconsistent with the Soviet Union's past statements. Indeed, the Court emphasized that the declaration was consistent with expert evidence in point. See *ibid.* That the Commissariat's declaration was deemed "conclusive" in the circumstances *Pink* presented scarcely suggests that all submissions by a foreign government are entitled to the same weight.

The Court of Appeals also reasoned that a foreign government's characterization of its own laws should be afforded "the same respect and treatment that we would expect our government to receive in comparable matters." 837 F. 3d, at 189. The concern for reciprocity is sound, but it does not warrant the Court of Appeals' judgment. Indeed, the United States, historically, has not argued that foreign courts are *bound* to accept its characterizations or precluded from considering other relevant sources.[6]

The understanding that a government's expressed view

———————

[6] The Chinese sellers assert, see Supp. Brief for Respondents 7–8, that the United States sought a greater degree of deference in a 2002 submission to a World Trade Organization panel. In fact, the submission acknowledged that "the Panel is not bound to accept the interpretation [of U. S. law] presented by the United States." Brief for United States as *Amicus Curiae* 29, n. 6 (quoting Second Written Submission of the United States of America, *United States—Section 129(c)(1) of the Uruguay Round Agreements Act,* WT/DS221 ¶11 (Mar. 8, 2002)).

of its own law is ordinarily entitled to substantial but not conclusive weight is also consistent with two international treaties that establish formal mechanisms by which one government may obtain from another an official statement characterizing its laws. Those treaties specify that "[t]he information given in the reply shall not bind the judicial authority from which the request emanated." European Convention on Information on Foreign Law, Art. 8, June 7, 1968, 720 U. N. T. S. 154; see Inter-American Convention on Proof of and Information on Foreign Law, Art. 6, May 8, 1979, O. A. S. T. S. 1439 U. N. T. S. 111 (similar). Although the United States is not a party to those treaties, they reflect an international practice inconsistent with the Court of Appeals' "binding, if reasonable" resolution.

\* \* \*

Because the Court of Appeals concluded that the District Court was bound to defer to the Ministry's brief, the court did not consider the shortcomings the District Court identified in the Ministry's position or other aspects of "the [D]istrict [C]ourt's careful and thorough treatment of the evidence before it." 837 F. 3d, at 191, n. 10. The correct interpretation of Chinese law is not before this Court, and we take no position on it. But the materials identified by the District Court were at least relevant to the weight the Ministry's submissions should receive and to the question whether Chinese law required the Chinese sellers' conduct. We therefore vacate the judgment of the Court of Appeals and remand the case for renewed consideration consistent with this opinion.

*It is so ordered.*