**PUBLIC COPY – SEALED INFORMATION DELETED**

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued December 14, 2018      Decided January 8, 2019

No. 18-3071

IN RE: GRAND JURY SUBPOENA

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-gj-00041)

---

Before: TATEL and GRIFFITH, *Circuit Judges*, and
WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

Opinion concurring in part and concurring in the judgment
filed by *Senior Circuit Judge* WILLIAMS.

PER CURIAM:[*] With the Foreign Sovereign Immunities Act
(the "Act"), Congress unquestionably set out a comprehensive
framework for resolving whether foreign states are entitled to
immunity in civil actions. But did Congress, through the same
Act, tell us how to handle claims for immunity in criminal cases
as well? That question looms large over this litigation

---

[*] **NOTE:** Portions of this opinion contain **sealed**
information, which has been redacted.

2

concerning a subpoena issued by a grand jury, but we find it unnecessary to supply a definitive answer. Assuming the Act's immunity applies, we hold that it leaves intact the district courts' subject-matter jurisdiction over federal criminal cases involving foreign sovereigns, and that there is a reasonable probability the information sought through the subpoena here concerns a commercial activity that caused a direct effect in the United States. Because the Act—even where it applies—allows courts to exercise jurisdiction over such activities, and because the ancillary challenges in this appeal lack merit, we affirm the district court's order holding the subpoena's target, a corporation owned by a foreign sovereign, in contempt for failure to comply.

## I.

The grand jury seeks information from a corporation ("the Corporation") owned by Country A and issued a subpoena directing the Corporation to produce that information. The Corporation moved to quash the subpoena, arguing that it is immune under the Act, or, alternatively, that the subpoena is unreasonable or oppressive (and therefore unenforceable under Federal Rule of Criminal Procedure 17(c)(2)) because it would require the Corporation to violate Country A's domestic law.

The district court denied the motion to quash. The Corporation took an immediate appeal, which an earlier panel of this court dismissed for lack of appellate jurisdiction. Per Curiam Order, *In re Grand Jury Subpoena*, No. 18-3068 (October 3, 2018). The district court then held the Corporation in contempt, imposing a fine of $50,000 per day until the Corporation complies with the subpoena, but stayed accrual

3

and execution of the penalty pending appeal. The Corporation then filed this appeal of the contempt order. Because this appeal involves exclusively legal questions, our review is de novo. *In re Sealed Case*, 146 F.3d 881, 883 (D.C. Cir. 1998) (reviewing contempt order de novo where the district court allegedly "applied the wrong legal standard"). In a judgment dated December 18, 2018, we affirmed the district court and explained that a full opinion would follow. This is that opinion.

## II.

Before 1952, foreign sovereigns enjoyed "complete immunity" in United States courts as "a matter of grace and comity." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). First articulated in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), that rule was in harmony with the then-existing "general concepts of international practice." Michael Wallace Gordon, *Foreign State Immunity in Commercial Transactions* § 3.01 (1991). Over the next century and a half, change slowly crept over the horizon. "[A]s foreign states became more involved in commercial activity," by taking over businesses and other historically private functions, many grew concerned that states could manipulate their immunity to obtain market advantages by evading accountability mechanisms that would hinder purely private corporations. *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 821–22 (2018) (noting that the State Department had expressed such a concern). As a result, several countries began stripping foreign sovereigns of their former immunity for "private," usually commercial, acts. Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in* 26 Department of State Bulletin 984–85 (June 23, 1952) ("Tate Letter").

**PUBLIC COPY – SEALED INFORMATION DELETED**

The United States joined this club in 1952, when the Acting Legal Adviser to the State Department issued a letter (known as the "Tate Letter") adopting this so-called "'restrictive theory of sovereign immunity.'" *Rubin*, 138 S. Ct. at 822 (quoting *Verlinden*, 461 U.S. at 488). The result "proved troublesome." *Verlinden*, 461 U.S. at 487. Because courts relied "primarily" on the State Department to guide them regarding which activities remained immune, many disputes that were essentially private had the potential to become spiraling diplomatic imbroglios for the administration of the day. *Id.* Nobody was especially happy with the outcomes: "inconsistent" immunity determinations heavily informed by "'political'" and diplomatic considerations. *Samantar v. Yousuf*, 560 U.S. 305, 312–13 (2010) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 690 (2004)).

Seeking to extract the State Department from this stew and "endorse and codify the restrictive theory of sovereign immunity," Congress passed the Foreign Sovereign Immunities Act in 1976. *Id.* at 313. Where the Act applies, it does three things relevant to this case: (1) as a general matter, it extends foreign sovereigns "immun[ity] from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604; (2) it creates exceptions to the rule of immunity under various circumstances, including cases based on certain "commercial activit[ies]" of the sovereign, *id.* § 1605(a)(2); and (3) it grants federal district courts subject-matter jurisdiction over certain "nonjury civil action[s]" against foreign states where they lack immunity, *id.* § 1330(a).

The key question here is whether the Act—including section 1604's grant of immunity—applies to civil and criminal proceedings alike. The Corporation tells us the Act does apply

5

here, and thereby immunizes the Corporation from this subpoena. The government responds that no part of the Act applies to criminal proceedings. "Immunity in criminal matters," the government assures us, "'simply was not the particular problem to which Congress was responding.'" Appellee's Br. 18 (quoting *Samantar*, 560 U.S. at 323).

The few circuits to consider this issue have reached differing conclusions, albeit in circumstances distinct from those here. *Compare Southway v. Central Bank of Nigeria*, 198 F.3d 1210, 1214 (10th Cir. 1999) (stating in context of a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim that the Act does not apply in criminal proceedings), *and United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997) (same, in case involving head-of-state immunity claim), *with Keller v. Central Bank of Nigeria*, 277 F.3d 811, 820 (6th Cir. 2002) (stating in context of civil RICO claim that the Act does apply in criminal proceedings), *partially abrogated by Samantar*, 560 U.S. 305. Mindful of our obligation to avoid sweeping more broadly than we must to decide the case in front of us, we need not weigh in on this dispute. As we explain below, even assuming section 1604's grant of immunity applies to criminal proceedings, the Corporation still lacks immunity from this particular subpoena.

## III.

Taking section 1604's grant of immunity as a given, the government must check three boxes for the contempt order to stand. First, there must be a valid grant of subject-matter jurisdiction. Second, one of the Act's exceptions to immunity must apply. And third, the contempt sanctions must be a permissible remedy. According to the district court, the government satisfies all three. We agree.

**PUBLIC COPY – SEALED INFORMATION DELETED**

## A.

We start, as we must, with subject-matter jurisdiction. The district court purported to exercise its inherent contempt power in aid of its criminal jurisdiction. *See FG Hemisphere Associates, LLC v. Democratic Republic of Congo*, 637 F.3d 373, 377 (D.C. Cir. 2011) (explaining that "federal courts enjoy inherent contempt power" that "runs with a court's jurisdiction"). The problem, according to the Corporation, is that the Act eliminated all criminal subject-matter jurisdiction over foreign sovereigns, taking the contempt power with it. The text of the relevant statutes, however, cuts against the Corporation's position. Section 3231 of title 18 gives federal courts original jurisdiction over "all offenses against the laws of the United States." It is hard to imagine a clearer textual grant of subject-matter jurisdiction. "All" means "all"; the provision contains no carve-out for criminal process served on foreign defendants. And nothing in the Act's text expressly displaces section 3231's jurisdictional grant. True, section 1604 grants immunity "from the jurisdiction of the courts," but that is no help to the Corporation. Linguistically, granting a particular class of defendants "immunity" from jurisdiction has no effect on the scope of the underlying jurisdiction, any more than a vaccine conferring immunity from a virus affects the biological properties of the virus itself.

To be sure, we have often referred to the Act's immunity provisions as affecting "subject matter jurisdiction." *See, e.g.*, *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). But in offering that characterization, we are not referring to section 1604. The provision that usually gives the exceptions to immunity their jurisdictional status is the Act's provision *conferring* subject-matter jurisdiction over foreign

**PUBLIC COPY – SEALED INFORMATION DELETED**

states in civil actions, codified at 28 U.S.C. § 1330(a). That section authorizes jurisdiction over certain nonjury civil actions "with respect to which the foreign state is not entitled to immunity." Thus, establishing that an exception to immunity applies is one element of invoking subject-matter jurisdiction under section 1330(a). *See Verlinden*, 461 U.S. at 489 (using section 1330(a) to link the immunity exceptions to subject-matter jurisdiction). This feature of section 1330(a) does not transmute the entirely separate section 1604 into a provision about subject-matter jurisdiction.

With no textual provision purporting to eliminate section 3231's grant of subject-matter jurisdiction, the Corporation instead focuses on section 1330(a). Although that provision by its terms merely *confers* jurisdiction over an unrelated set of civil cases, the Corporation assures us that, as with an iceberg, much hides beneath the surface. Specifically, the Corporation reads the provision to silently and simultaneously *revoke* jurisdiction over any case not falling within its terms, including any criminal proceeding.

Ordinarily, that argument would be a tough sell. We are usually reluctant to view one statute as implying a limited repeal of another where the two are capable of coexisting. *See Morton v. Mancari*, 417 U.S. 535, 550 (1974) ("In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."). But the Corporation argues this usual rule has no force in the context of foreign sovereign immunities, citing the Supreme Court's statement, first appearing in *Argentine Republic v. Amerada Hess Shipping Corp.*, that the Act is "the sole basis for obtaining jurisdiction over a foreign state in our courts." 488 U.S. 428, 434 (1989).

8

**PUBLIC COPY – SEALED INFORMATION DELETED**

*Amerada Hess* was a civil action. *Id.* at 431. The plaintiffs sought relief in tort from Argentina for having bombed their neutral ship in the course of Argentina's war with the United Kingdom over the Falkland, or Malvinas, Islands. *Id.* at 431–32. Because the Act pretty plainly granted Argentina immunity for this essentially sovereign act, *see id.* at 439–43, the plaintiffs sought to circumvent that immunity by invoking subject-matter jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350, which unlike section 1330(a) makes no mention of the immunity exceptions. Rebuffing that effort, the Supreme Court concluded that founding jurisdiction on the Alien Tort Statute—or, for that matter, any "other grant[] of subject-matter jurisdiction *in Title 28*," *id.* at 437 (emphasis added)—would conflict with Congress's choice "to deal comprehensively with the subject of foreign sovereign immunity in the" Act, *id.* at 438. To avoid that outcome, when it comes to foreign sovereigns, the Court held that section 1330(a) precludes subject-matter jurisdiction under other, more general grants, listing the Alien Tort Statute and a bevy of other examples from the civil code in title 28. *Id.* at 437–39. Subsequent decisions from the Supreme Court and this court echoing that conclusion can all be traced back to *Amerada Hess*. *See, e.g.*, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (quoting *Amerada Hess*); *Schermerhorn v. State of Israel*, 876 F.3d 351, 353 (D.C. Cir 2017) (same). Neither the Supreme Court nor this court has ever extended *Amerada Hess*'s holding to a criminal proceeding.

Uncritically applying the exclusivity rule from *Amerada Hess* in the criminal context would yield the conclusion the Corporation prefers: no jurisdiction, as this grand jury proceeding is plainly not a "nonjury civil action" covered by section 1330(a). But even the briefest peek under the hood of

9

**PUBLIC COPY – SEALED INFORMATION DELETED**

*Amerada Hess* shows that the Supreme Court's reasons for finding section 1330(a) to be the exclusive basis for jurisdiction in the civil context have no place in criminal matters.

Crucial to the Court's logic in *Amerada Hess* was that the immunity provision in section 1604 and the jurisdictional provision in section 1330(a) would "work in tandem"—that is, that immunity and jurisdiction would rise and fall together. 488 U.S. at 434. In its opinion, the Court gave no hint at all that it intended to create a loophole where, in criminal cases clearly covered by an exception to immunity, a district court would nevertheless lack subject-matter jurisdiction. On the contrary, the Court was chiefly concerned that exercising jurisdiction under other provisions in title 28 would provide an end run around the Act's immunity provision. *See Amerada Hess*, 488 U.S. at 436 ("From Congress' decision to deny immunity to foreign states in [a certain] class of cases . . . , we draw the plain implication that immunity is granted in those cases involving alleged violations of international law that do not come within one of the [Act's] exceptions."). There is no danger of that evasion here: section 1604 tells us that, where the Act applies, an action must fall within one of the listed exceptions and says nothing about excluding criminal actions.

In fact, a reading that embraces absolute immunity in criminal cases is much harder to reconcile with the Act's context and purpose. The Act's "[f]indings and declaration of purpose" section explains that Congress intended that states would "not [be] immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned." 28 U.S.C. § 1602; *accord Rubin* 138 S. Ct. at 822 (Congress sought to hold foreign sovereigns "accountable, in certain circumstances, for their actions"). As the Corporation admits, however, under its reading a foreign-sovereign-owned, purely commercial

10

enterprise operating within the United States could flagrantly violate criminal laws and the U.S. government would be powerless to respond save through diplomatic pressure. What's more, such a reading would signal to even non-sovereign criminals that if they act through such an enterprise, the records might well be immune from criminal subpoenas.

We doubt very much that Congress so dramatically gutted the government's crime-fighting toolkit. The notion is that much harder to swallow given how unsettled the common law of criminal immunities for a corporation owned by a foreign state was in 1976 and remains today. *See, e.g.*, *In re Investigation of World Arrangements*, 13 F.R.D. 280, 291 (D.D.C. 1952) (suggesting the law may not recognize immunity for a "commercial venture, entirely divorced from any governmental function"); Andrew Dickinson, *State Immunity & State-Owned Enterprises*, 10 No. 2 Bus. L. Int'l 97, 124–25 (2009) (positing that international law might allow criminal prosecutions of "state-owned enterprises"). The lack of reported cases—before and after the Act—considering criminal process served on sovereign-owned corporations only highlights this uncertainty. From that paucity, the Corporation would have us infer that such corporations are universally understood to possess absolute immunity, but that notion strikes us as highly speculative. An equally likely explanation for the absence of cases is that most companies served with subpoenas simply comply without objection.

Faced with such uncertainty, if Congress really intended to furnish a definitive answer to such a fraught question, one would expect that answer to show up clearly in the Act's text, or at least to have been the subject of some discussion during the legislative process. *Cf. MCI Telecommunications Corp. v. American Telephone and Telegraph Co.*, 512 U.S. 218, 23

11

**PUBLIC COPY – SEALED INFORMATION DELETED**

(1994) (holding Congress did not authorize "a fundamental revision" of the law through a "subtle device"). Yet the "Act and its legislative history do not say a single word about possible criminal proceedings under the statute." Joseph W. Dellapenna, *Suing Foreign Governments and Their Corporations* 37 (2d ed. 2003). To the contrary, the relevant reports and hearings suggest Congress was focused, laser-like, on the headaches born of private plaintiffs' civil actions against foreign states. *See, e.g.*, H.R. Rep. No. 94-1487, at 6 (1976) (identifying the Act's purpose as "provid[ing] when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States"); *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary*, 94th Cong. 24 (1976) (testimony of Monroe Leigh, Legal Adviser, Department of State) (testifying that the "question" the Act addressed was "[h]ow, and under what circumstances, can private persons maintain a lawsuit against a foreign government or against a commercial enterprise owned by a foreign government"). There is, accordingly, scant evidence that Congress sought to resolve such a significant and unsettled issue.

This case is thus unlike *Amerada Hess*. We do not read case law with the same textual exactitude that we would bring to bear on an Act of Congress. *See Illinois v. Lidster*, 540 U.S. 419, 424 (2004) ("[G]eneral language in judicial opinions" should be read "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering."). Given the relevant statutes and the Supreme Court's reasoning, this is a situation where the Court's earlier statements, "[t]hough seemingly comprehensive," do "not

12

provide a clear answer in this case." *Altmann*, 541 U.S. at 694. Since section 3231 and the Act can coexist peacefully, we have no trouble concluding that the Act leaves intact the district court's criminal jurisdiction to enforce this subpoena.

The Corporation warns us that reaching this conclusion will create a new circuit split, based on the Sixth Circuit's opinion in *Keller v. Central Bank of Nigeria*. But we see no conflict. Assessing whether the Act leaves room for criminal prosecutions, the *Keller* court considered whether the Act itself contains a specific exception for criminal cases. 277 F.3d at 820 (noting the Act contains no general "exception for criminal jurisdiction"). No party drew the court's attention to the separate grant of subject-matter jurisdiction in section 3231, and the Sixth Circuit has yet to squarely address whether that provision can support jurisdiction consistent with the Act. Accordingly, confronted with the same issue we face here, the Sixth Circuit would be free to reach the same conclusion we do: that section 3231 can be invoked in conjunction with the Act.

At oral argument, the Corporation offered a new theory: that section 3231 *never* authorized subject-matter jurisdiction over criminal proceedings involving foreign sovereigns, even before the Act. Section 3231's text, however, contradicts that argument, as it authorizes jurisdiction over "all offenses against the laws of the United States." The Corporation's underdeveloped position appears to rest on language from pre-Act judicial opinions stating that, under the former regime of complete immunity, a court lacked "jurisdiction" over a case against a foreign sovereign. *See, e.g.*, *Schooner Exchange*, 11 U.S. (7 Cranch) at 135 (warship owned by foreign sovereign is "exempt from the jurisdiction of the country"). But those opinions date from an era when the word "[j]urisdiction" had

13

"many, too many, meanings." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90 (1998) (internal quotation marks omitted) (quoting *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)). In those days, the word's more "elastic" conception did not necessarily refer to statutory subject-matter jurisdiction. *United States v. Cotton*, 535 U.S. 625, 630 (2002). As the Supreme Court's later cases have clarified, the doctrine of foreign sovereign immunity that pre-dated the Act "developed as a matter of common law," not statutory construction. *Samantar*, 560 U.S. at 311. And we know that courts did not think the doctrine affected statutory subject-matter jurisdiction because the immunity could be waived at the behest of the U.S. government. *Id.* at 311–12. Even at that time, a congressional limit on subject-matter jurisdiction could not have been waived. *See Louisville & Nashville Railroad Co. v. Mottley*, 211 U.S. 149, 152 (1908) ("Neither party has questioned that jurisdiction, but it is the duty of this court to see to it that the jurisdiction of the circuit court, which is defined and limited by statute, is not exceeded."). We therefore find no merit to the Corporation's contention that section 3231's historical reach excluded foreign sovereigns.

**B.**

Subject-matter jurisdiction is, however, just the beginning. As we have assumed that section 1604 applies, the Corporation is immune from the court's criminal jurisdiction, as well as its associated contempt power, unless one of the Act's exceptions applies.

Before diving into the substance of those exceptions, we pause briefly to dispel the Corporation's claim that section 1605(a)'s exceptions are categorically unavailable in criminal cases. The text easily resolves this issue in the government's

14

favor. Section 1605(a)'s exceptions apply to "any case" that falls within one of the listed provisions. That language—"any case"—is notable because, as section 1330(a) demonstrates, Congress knows how to limit a provision to a "civil action" when it wants to. Congress's choice to extend the section 1605(a) exceptions to "any case," instead of just "civil actions," tells us that they are available in criminal proceedings.

Moving to those exceptions, in its *ex parte* filing the government steers us to the third clause of section 1605(a)(2). That provision denies immunity in an "action . . . based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere [when] that act causes a direct effect in the United States."

Ordinarily, the Corporation would bear the burden to establish that the exception does *not* apply. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 344–45 (D.C. Cir. 2018) ("[T]he foreign-state defendant bears the burden of establishing the affirmative defense of immunity," including "'proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity.'" (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000))). Here, however, the government relies primarily on *ex parte* evidence unavailable to the Corporation. We have repeatedly approved the use of such information when "necessary to ensure the secrecy of ongoing grand jury proceedings," *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1075 (D.C. Cir. 1998), and we do so again here. But where the government uses *ex parte* evidence, we think the burden falls on the government to establish that the exception applies, and we will conduct a searching inquiry of the government's

15

evidence and legal theories as a substitute for the adversarial process.

Of course, at this stage, it would be putting the cart well before the horse to require the government to definitively prove that the factual predicates for the exception exist. The usual rule is that the showing necessary to find an exception applicable travels with the burden on the merits—for example, in a motion to dismiss where a defendant challenges only the "legal sufficiency" of the complaint, the exception must merely be plausibly pled. *Phoenix Consulting*, 216 F.3d at 40. We see no reason to depart from that rule here. As we have explained in the personal-jurisdiction context, any other rule would risk "'invert[ing] the grand jury's function'" by "'requiring that body to furnish answers to its questions before it could ask them.'" *In re Sealed Case*, 832 F.2d 1268, 1274 (D.C. Cir. 1987) (quoting *In re Grand Jury Proceedings Harrisburg Grand Jury 79-1*, 658 F .2d 211, 214 (3d Cir. 1981)). As with personal jurisdiction, then, we ask whether the government has shown a "'reasonable probability'" that the exception applies. *See id.* (quoting *Marc Rich & Co. v. United States*, 707 F.2d 663, 670 (2d Cir. 1983)).

The government's *ex parte* evidence satisfactorily makes the necessary showing.

**PUBLIC COPY – SEALED INFORMATION DELETED**



These facts establish a "reasonable probability" that section 1605(a)(2) covers this subpoena.

All that remains, then, is to assess whether this "action"—that is, the subpoena—is "based upon" this act—                 . We think it is. In a typical case, to know what the action is "based upon," we look to the "'gravamen'" or "core" of the action—that is, "'those elements . . . that, if proven, would entitle [a party] to relief.'" *OBB*

**PUBLIC COPY – SEALED INFORMATION DELETED**

*Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 395–96 (first alteration in original) (quoting *Saudi Arabia*, 507 U.S. at 357). The Supreme Court has offered some guidance on how to ascertain that core, explaining that a court should "identify the particular conduct on which the plaintiff's action is based." *Id.* (quoting *Saudi Arabia*, 507 U.S. at 356) (internal quotation marks and alterations omitted). Just how we apply this test in the context of a subpoena is not immediately obvious. The "gravamen" of a subpoena may be the mere fact that an entity possesses the documents in question. Alternatively, the "gravamen" may be related to the content of the records and why they may be relevant to the government's investigation. Indeed, the correct approach may well vary with the facts of a given case. Here, however, we need not resolve that issue,



Because the statutory elements for the exception are all present, it makes no difference that

**PUBLIC COPY – SEALED INFORMATION DELETED**



## C.

With subject-matter jurisdiction and the commercial activity exception out of the way, we are left with the remedy. As long as the Act permits monetary contempt sanctions, sovereign immunity offers the Corporation no refuge. Circuit precedent provides a clear answer: as we held in *FG Hemisphere*, "contempt sanctions against a foreign sovereign are available under the" Act. 637 F.3d at 379. In that case, we upheld a civil contempt order against the Democratic Republic of the Congo very similar to the one imposed here. *Id.* at 376 (describing penalty of "$5,000 per week, doubling every four weeks until reaching a maximum of $80,000 per week"). We did so by dividing "the question of a court's power to impose sanctions from the question of a court's ability to enforce that judgment through execution." *Id.* at 377. We stick to that practice today, meaning the form of the district court's contempt order was proper. Whether and how that order can be enforced by execution is a question for a later day.

## IV.

Alternatively, the Corporation invokes Federal Rule of Criminal Procedure 17(c)(2), asserting the subpoena is "unreasonable or oppressive"—and must therefore be quashed—because it would require the Corporation to violate Country A's domestic law. Adhering to Federal Rule of

19

Criminal Procedure 26.1, we treat "[i]ssues of foreign law" as "questions of law." But, as the party who "relies on foreign law," the Corporation "assumes the burden of showing that such law prevents compliance with the court's order." *In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) (per curiam). Its efforts to carry that burden fall short.

The Corporation claims that complying with the subpoena would run afoul of Country A's law ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

The text of the law favors the government. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

20



The Corporation claims that such a reading is "absurd,"

But that claim is belied by

To combat this reading of the text, in the district court and at the briefing stage in this court, the Corporation relied on two declarations from its retained counsel.

Pointing to the Supreme Court's recent decision in *Animal Science Products, Inc. v. Hebei Welcome Pharmaceutical Co.*, 138 S. Ct. 1865, 1873 (2018), the Corporation urges us to "carefully consider" these declarations.

**PUBLIC COPY – SEALED INFORMATION DELETED**

Of course, we agree that the declarations warrant our careful consideration. But we must also heed the Supreme Court's additional instruction in *Animal Science Products* to scrutinize, when evaluating a foreign state's position regarding the contents of its own law, "the statement's clarity, thoroughness, and support; its context and purpose; . . . [and] the role and authority of the entity or official offering the statement." *Id.* Those factors all counsel against accepting the Corporation's position here. The declarations are quite cursory, and they contain no citations to authority or Country A's case law. Moreover, the statements come from the retained counsel of a party with a direct stake in this litigation, and they were plainly prepared with this particular proceeding in mind. Under those circumstances, our careful consideration of the declarations leads us to conclude that they shed little light on the meaning of Country A's law as it would be interpreted by that nation's courts.

Following similar criticisms from the district court and the government, and after briefing was complete in this court, the Corporation submitted a *new* declaration, this time from a regulatory body of Country A. The government urges us to strike this filing as untimely. Although that position is not without merit, exercising an abundance of caution and giving due deference to Country A's sovereign status, we will consider the filing.

Unfortunately for the Corporation, however, the filing fails to cure the crucial deficiencies of the original declarations. The new filing still fails to cite a single Country A court case articulating the Corporation's preferred interpretation of the law.

**PUBLIC COPY – SEALED INFORMATION DELETED**

These omissions, combined with the fact that the statement was clearly prepared in response to this litigation and at a very late hour, leave us unpersuaded that the statement accurately reflects how Country A's courts would interpret the relevant provision. Because the Corporation has failed to satisfy its burden of showing that Country A's law would prohibit complying with the subpoena, we agree with the district court that enforcing the subpoena is neither unreasonable nor oppressive.

## V.

Finally, the Corporation remains dissatisfied with this court's ruling on its first appeal. It claims that, out of respect for its foreign sovereign status, we should not have adhered to our usual rule requiring a contempt order before taking appellate jurisdiction over denial of a motion to quash. Even if we had the power to undo a prior panel's work in some circumstances, we could not do so here. Because the district court has now held the Corporation in contempt, any opinion by us on whether that procedure was necessary would be entirely advisory. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) ("[A] federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.'" (quoting *North*

**PUBLIC COPY – SEALED INFORMATION DELETED**

*Carolina v. Rice*, 404 U.S. 244, 246 (1971))). We therefore dismiss as moot this aspect of the Corporation's appeal.

## VI.

For the foregoing reasons, we deny the government's motion to strike and affirm the district court's contempt order.

*So ordered.*

WILLIAMS, *Senior Circuit Judge*, concurring in part and concurring in the judgment:  I concur in the court's opinion in full except with respect to Part III.B.  I believe clause 1 of 28 U.S.C. § 1605(a)(2) most compellingly establishes grounds for the government's contention that the Corporation is not immune to the subpoena.

Section 1605(a) provides:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . .

>> (2) in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a) (bracketed numbers added).

Invoking clause 1, the government contends that the "action"—i.e., the subpoena—is "based upon" the Corporation's "commercial activity" (its "regular course of commercial conduct," 28 U.S.C. § 1603(d)) carried on in the United States by an American office of the Corporation.  See Br. for United States 32–33 & n.16.  As the government sees it, this general U.S. commercial activity is the "particular conduct" that forms the "basis," "gravamen," or "core" of the subpoena action—those "elements . . . that, if proven, would entitle [the government] to relief," *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 395, 396 (2015)—because it is *this*

2

activity that forms the "minimum contacts" necessary to bring any of the Corporation's documents (wherever they may be) within the jurisdiction of the district court, see *In re Sealed Case*, 832 F.2d 1268, 1273–74 (D.C. Cir. 1987), *abrogated on other grounds by Braswell v. United States*, 487 U.S. 99 (1988). This theory does not rely on any asserted "connection" between the Corporation's contacts with the United States and the subpoena "at issue," *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 141 (2d Cir. 2014), and thus rests on the commercial conduct that subjects the Corporation (and its records) to general, not specific, jurisdiction. See, e.g., Letter from Government to Corporation's Counsel 2 (July 30, 2018), J.A. 32 ("The subpoena was served on [the Corporation] [at a U.S. office] . . . . That [office] is not an independent entity. And [an entity] doing business in the United States is required to produce documents called for by a subpoena that are within [its] possession . . . , regardless of whether [the entity] must retrieve the records from outside the country."); see also Br. for United States 32 (disclaiming reliance on "*ex parte* material" because the government's theory turned only on the "considerable business" of a U.S. office of the Corporation).

On the facts before us the government's theory has a gap: Its theory of minimum contacts is, to put it charitably, a bit outdated. An entity's "'considerable business' in the United States," Br. for United States 32, will not, on its own, open all files—wherever they may be—to the prying eyes of U.S. prosecutors. See, e.g., *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559 (2017) (explaining that general jurisdiction does not turn on the "magnitude" of an entity's business contacts with the U.S.; courts look to where the entity is "at home"). That is so, even where, as here, a subpoena is served on a U.S. office of a foreign corporation. See, e.g., *Leibovitch v. Islamic Republic of Iran*, 852 F.3d 687, 689–90 (7th Cir. 2017) (quashing subpoenas, served on foreign banks' U.S. branches, seeking

3

information held by those banks outside the United States regarding Iranian assets); *Sealed Case*, 832 F.2d at 1273 (holding that "service of a subpoena" on a company's agent "cannot confer on the [government] a right to inspect [the company's] records unless it can show that the District Court possesses personal jurisdiction over [the company]").

But the Corporation raised no objection to the government's outdated understanding of what U.S. contacts were necessary to bring a foreign entity (and the documents it possesses) within the general jurisdiction of our courts. See Memorandum Opinion 2 n.2, *In re Grand Jury Subpoena No. 7409*, No. 18-gj-041 (D.D.C. Sept. 19, 2018) ("[T]he [Corporation] has not disputed this Court's personal jurisdiction over the [Corporation's] overseas [offices] . . . , thus waiving any objection on that ground."). Nor was an objection made before us. The government's theory on the subject therefore stands unrebutted, and is sufficient to compel compliance with the subpoena.

To the extent the Corporation offers *any* argument to rebut the government's theory, it is plainly inadequate. The Corporation's defense on this subject in its entirety is as follows:

> Even if the commercial-activity exception applied outside the context of nonjury civil actions involving a claim for relief—it does not—the exception would not apply here (at least based on the information available to the [Corporation]). The [Corporation] . . . does not have documents responsive to the subpoena [in the United States]. See *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35–36 (D.C. Cir. 2014). And it would violate notions of sovereign dignity and international comity to strip a foreign sovereign of its immunity

**PUBLIC COPY – SEALED INFORMATION DELETED**

based on *ex parte* filings that the sovereign cannot contest.

Appellant's Br. 27–28.

But the argument that the Corporation "does not have" responsive documents in the United States, *id.* at 28, does nothing to refute the government's actual argument—that the Corporation's "considerable business" in the United States subjected it (and all its documents, worldwide) to the jurisdiction of the district court, Br. of United States 32. And even if the Corporation's words arose from some intuition that the government had failed to meet the requirements for general personal jurisdiction, its "skeletal" treatment of such an argument, "leaving the court to do counsel's work," was hardly sufficient. *Masias v. EPA*, 906 F.3d 1069, 1077 (D.C. Cir. 2018) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

What of the objection based on the international impropriety of stripping "a foreign sovereign of its immunity based on *ex parte* filings that the sovereign cannot contest"? This is completely inapposite on the issue of general jurisdiction. The government's argument under clause 1 was made "without resort to *ex parte* material," Br. for United States 32. And this opinion relies on no redacted material.

Like any subpoenaed party, of course, the Corporation has a potential right to try to quash the subpoena on grounds of relevance, and that potential right may have been theoretically impaired by the secrecy of grand jury investigations. But given that secrecy and the extraordinary latitude for assessing relevance, the rights of a garden-variety party subpoenaed by a grand jury to challenge relevance are well-nigh negligible. Any incremental impact due to the Corporation's foreign character

5

inflicts no injury on "notions of sovereign dignity and international comity," Appellant's Br. 28—certainly no injury to call for a restricted reading of § 1605(a)(2), clause 1.

The Corporation has known of the government's broad claim to personal jurisdiction (based on the Corporation's general commercial activity in the U.S.) from day one—during pre-court negotiations, at the district court, and, now, on appeal. See Letter from Government to Corporation's Counsel 2 (July 30, 2018), J.A. 32; Gov't's Resp. in Opp'n 10–11, *Grand Jury Subpoena No. 7409*, No. 18-gj-041 (D.D.C. Aug. 24, 2018), J.A. 115–16; Br. for United States 32–33. Its failure to respond, then, is attributable to it alone. And where, as here, arguments as to the scope of personal jurisdiction are forfeited, no more is needed.

In this case, then, denial of immunity and affirmance of the contempt order can rest on the ground that the subpoena was "based upon" the general "commercial activity carried on in the United States" by a U.S. office of the Corporation. 28 U.S.C. § 1605(a)(2).