FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PENG SHEN, | No. 16-71315 |
| *Petitioner*, | Agency No. |
| v. | A200-275-534 |
| MERRICK B. GARLAND, Attorney General, | OPINION |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 17, 2022
Pasadena, California

Filed July 24, 2024

Before:  Eric D. Miller and Daniel P. Collins, Circuit
Judges, and Edward R. Korman,* District Judge.

Opinion by Judge Collins;
Dissent by Judge Miller

---

* The Honorable Edward R. Korman, United States District Judge for the
Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Immigration

The panel granted Peng Shen's petition for review of the Board of Immigration Appeals' decision upholding the denial of asylum and related relief on adverse credibility grounds, and remanded.

Shen testified that a mandatory pre-marital health exam led to the discovery that she was pregnant, which in turn led to her forced abortion. The BIA upheld the immigration judge's adverse credibility determination based, in part, on Shen's inconsistent testimony and demeanor after counsel for the Department of Homeland Security ("DHS") suggested on cross-examination that the Chinese government had eliminated its requirement for pre-marital health check-ups by the time Shen underwent her examination in January 2003. After the panel inquired at oral argument whether the record revealed exactly when the referenced change in Chinese law had taken effect, and DHS counsel responded that it did not, Shen's counsel submitted a citation to an August 19, 2003, article from the official *China Daily* newspaper announcing the elimination of the mandatory premarital health examination requirement effective October 1 of that year. The panel requested supplemental briefing to address whether the court could take judicial notice of the effective date of the repeal of the health examination requirement, and the impact on the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

credibility determination if the change occurred after Shen underwent her health checkup.

The panel concluded that it could properly make an independent determination, as a question of foreign law, that the relevant change in Chinese law took effect on October 1, 2003. As a result, DHS counsel's suggestion in cross-examination that the requirement had already been repealed at the time of Shen's check-up rested on a clear misstatement of the applicable Chinese law. That error, in turn, led the IJ to wrongly conclude that Shen became flustered after being confronted with information showing that her statements were false, and vitiated the agency's given reasons for concluding that this cross-examination supported the adverse credibility determination.

The panel rejected the Government's argument that Shen had failed to exhaust the legal question of the Chinese law's effective date. Given DHS counsel's misstatement of Chinese law, the agency, as the trier of fact, could reasonably come out either way as to the resulting effect on Shen's credibility. Accordingly, the panel remanded for a reassessment of this credibility ground. Considering the totality of the circumstances, the panel also concluded that the BIA's only remaining factor for upholding the adverse credibility determination was insufficient, standing alone, to avoid a remand.

Dissenting, Judge Miller wrote that the panel inappropriately considered the date of the Chinese policy change where Shen did not raise the issue in her brief to this court, did not exhaust any arguments based on the *China Daily* article before the agency, and the article was not part of the administrative record. Additionally, in Judge Miller's view, as it relates to this case, the date of the policy change

presented a question of fact, not one of law. Moreover, the *China Daily* article and other sources the majority cited referencing the text of China's marriage regulations did not demonstrate that Shen was compelled to undergo a pre-marital health exam in January 2003. Judge Miller would uphold the credibility determination as supported by substantial evidence.

## COUNSEL

Thomas J. Tarigo (argued), Law Offices of Thomas J. Tarigo, Los Angeles, California, for Petioner.

Raya Jarawan (argued), Ruth R. O'Sullivan, and Matthew B. George, Trial Attorneys, Office of Immigration Litigation, Civil Division; Derek C. Julius, Senior Litigation Counsel; Anthony C. Payne, Assistant Director, Office of Immigration Litigation; Brian M. Boynton and Benjami C. Mizer, Principal Deputy Assistant Attorneys General, Civil Division; Chad A. Readler, Acting Assistant Attorney General, Civil Division; United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

COLLINS, Circuit Judge:

Peng Shen, a citizen of the People's Republic of China, applied for asylum, withholding of removal, and relief under the Convention Against Torture. An Immigration Judge ("IJ") rejected her application in an order that found her not

to be a credible witness, based on her demeanor and inconsistencies in her testimony. On appeal, the Board of Immigration Appeals ("BIA") upheld the IJ's order, and Shen then petitioned this court for review. Because we conclude that the agency's credibility determination may have been affected by a misstatement of Chinese law that was a centerpiece of the Government's cross-examination of Shen at her removal hearing, we grant Shen's petition and remand for further proceedings.

# I

## A

In July 2011, Shen arrived in the United States from China on a nonimmigrant tourist visa that permitted her to stay only until January 5, 2012. However, on December 8, 2011, Shen filed an application for asylum, withholding of removal, and relief under the Convention Against Torture, alleging that she had been subjected to a forced abortion in China in February 2003. *See* 8 U.S.C. § 1101(a)(42) (providing that, for purposes of determining eligibility for asylum, "a person who has been forced to abort a pregnancy . . . shall be deemed to have been persecuted on account of political opinion"). While her application was still pending, the Department of Homeland Security ("DHS") initiated removal proceedings in March 2012 by serving Shen with a Notice to Appear asserting that she was removable for having overstayed her visa. *See* 8 U.S.C. § 1227(a)(1)(B). At an initial hearing in immigration court in May 2012, Shen conceded removability as charged, but she stated that she wished to pursue her application for asylum and other relief.

A merits hearing on Shen's application was held before an IJ in February 2015. When questioned about her claim that she had a compulsory abortion, Shen initially stated that

the abortion occurred in February 2011, but she immediately corrected herself and said that it was "2013." When asked what was the right year, Shen again corrected herself and said "2003." According to Shen, in January 2003 she went for a premarital medical examination that Chinese law required before she could be issued a license to marry her then-fiancé. She testified that, during the examination, it was discovered that she was pregnant, which was a violation of the "Chinese family planning process." Shen stated that she was informed that she must obtain an abortion before she would be issued a marriage license. She also said that her pregnancy was reported to the leader of her local work unit at the Chinese Youth Travel Agency in Chengdu. Shen stated that she took no steps to obtain an abortion, but that, on February 11, 2003, the director of the family planning unit of her work unit and two others forcibly took her from her workplace to the hospital, where an abortion was involuntarily performed on her while she was physically restrained. Shen also testified that, in April 2004, she had a medically necessary surgery due to an ectopic pregnancy.

During cross-examination, counsel for DHS challenged Shen's assertion that Chinese law required her to obtain a premarital medical examination:

> DHS Counsel: Isn't it true that in 2003 the Chinese government did away with the requirement that couples present themselves for pre-marital checkups?

> Shen: Pre-marital checkup; it's part of the responsibilities for children. What I meant is, I thought that it's necessary to get the checkup of both parties whether both parties are healthy.

IJ: Okay. Ma'am, you need to listen. Why don't you try and listen to the question.

DHS Counsel: Ma'am, isn't it true that in 2003 the Chinese government did away with the requirement that couples have to submit themselves to a pre-marital check up to obtain a marriage license?

Shen: Well, I went to get the checkup done. I don't know whether what you say is true.

DHS Counsel: Okay. So, why did you—you went voluntarily?

Shen: I went there voluntarily.

DHS Counsel: So, it was not a requirement or was it?

Shen: It was not.

DHS Counsel: Okay.

Shen: Nobody forced me to go.

IJ: Oh. So it was not a requirement?

Shen: No. Somebody should not be required. Well, looking at it this way, probably not.

At that point, the IJ intervened, asking Shen whether DHS counsel was correct in stating "that they actually did away with that requirement," and Shen said "Yes." The IJ pressed Shen on the apparent contradiction with her earlier testimony, and Shen evidently became distraught. The IJ told her to "[c]alm down, because this is very important," given that "what you're saying now contradicts what you said earlier." The IJ also stated, "I'll note for the record

[Shen] appears to be crying." The hearing transcript reflects that, when Shen was asked directly to "explain" the discrepancy in her testimony, the next comment was the IJ's statement that "[Shen] has taken a deep breath and is pausing." When Shen still said nothing, the IJ asked, "Can you answer this question or can you not?" Shen asked to have the question repeated and the IJ stated, "Well, we're going to try it. This will be the last time. Okay, and the court believes that you're having difficulty because of this contradiction, and you don't appear to be able to answer the question." When pressed again to explain the inconsistency, Shen stated:

> Yes. I did contradict myself. I admit I have misspoken. Even it's up to now that you finally—it has been brought to my attention pre-marital checkup was done by a voluntary basis, not by force. About this matter; it happened in year 2003, and on top of that I'm quite nervous today. I'm sorry.

The IJ did not issue a ruling at the end of the February 2015 hearing, but instead took the matter under submission. At a further hearing in August 2015, the IJ issued a written decision denying Shen's application for relief. The IJ's denial of relief rested primarily on her conclusion that Shen was "not a credible witness." In finding Shen not credible, the IJ relied on five grounds.

First, the IJ noted that Shen admitted that she had falsely claimed that she was married when she applied for a tourist visa to the U.S. in 2011. At the merits hearing on her application, Shen explained that she lied about her marital status because she had been told by the "middle agent" who

assisted her that she was more likely to succeed in getting a visa if she was listed as married. The IJ acknowledged that misrepresentations to obtain entrance to the U.S. may sometimes *support* an application for relief by affirmatively demonstrating the alien's effort to escape persecution, but the IJ did not believe that that was the case here. As the IJ explained, the alleged forced abortion had occurred eight years earlier, and Shen specifically testified that she did not form the intent to seek asylum until *after* she had arrived in the U.S.

Second, the IJ stated that Shen's credibility was undermined by her initial confusion about the year in which her forced abortion occurred. The IJ concluded that, although "misremembering dates is common and, in isolation, trivial," the range of years provided by Shen "were separated by over a decade," and Shen was unable to explain why she provided dates with "such vast differences."

Third, the IJ held that Shen had "testified inconsistently regarding her pre-marital checkup." The IJ explained her reasoning as follows (citation omitted):

> Initially, she claimed such checkups were required to obtain a marriage license. When confronted with contradictory information by the Department, she began to cry. Given the opportunity to explain her statement, she asked for the question to be repeated. She then took several deep breaths and a long pause, asked for the question to be repeated again, and then admitted that she had contradicted herself. [Shen] then explained that she underwent the checkup voluntarily, and that she misremembered because it was

> so long ago. Although individuals are wont to misremember details from a decade ago, [Shen's] demeanor upon questioning was telling. She cried when confronted with information showing her statement was false, took a long pause before formulating a response, and asked for the question to be repeated twice. The Court finds it likely that she was stalling in order to formulate a response, and that her demeanor thus further undermines her credibility.

Fourth, the IJ held that Shen's testimony was "inconsistent with the documentary evidence." Shen had submitted a copy of her household register as documentary evidence, and the register was accompanied by a Chinese-language "notarial certificate" attesting to the authenticity of the register and to the accuracy of the accompanying English translation of the register. According to its accompanying English translation, the notarial certificate was dated "February 14, 2012" and included the notary's statement that the attached register was "a true copy of the *Household Register* presented to me by Ms[.] Shen Peng." At the hearing, DHS counsel asked Shen how was "this possible since you were here [in the U.S.] on February 14, 2012." Shen responded, "I'm sorry. I came here on July 6, 2011." DHS counsel then said, "Correct. So, how is it possible that you presented the household register to this notary in China," and Shen replied, "I showed it to the notarial clerk." Shen's own counsel then showed her the date and said "You see, this is the date of issue. You were already here. How can this be?" After Shen stated that she did not understand, the IJ intervened and explained the issue very carefully, and Shen said, "My father went to the notary place and got it for

me." When pressed further, Shen stated, "First of all, I asked my dad to do this notary. I asked somebody to take my I.D. card, and bring it back to China. I got those two sets [of documents] because it was my dad who got them for me." In her written ruling, the IJ stated that, because "the certificate unambiguously states that [Shen] presented it in China," Shen's "claims regarding the document undermine its authenticity and, thus, her veracity."

Fifth, the IJ concluded that there was an inconsistency between Shen's written statement in support of her asylum application and her testimony at the hearing. In her declaration, Shen stated that, when the "clerk of [the] marriage registration department" told her that she "had to have the abortion first" before she and her then-fiancé "could register [their] marriage," Shen "cried out in front of the clerk, and begged not to kill [her] baby." In her written decision, the IJ thought that this comment was inconsistent with Shen's hearing testimony. Specifically, the IJ pointed to Shen's testimony that (1) after meeting with the marriage registration department, she decided to ignore the instruction to get an abortion, and (2) Shen did not expect that she would be physically carried away to the hospital in the way that she subsequently was.

Having found Shen not credible, the IJ further concluded that the documentary evidence that Shen had submitted was "insufficient to corroborate her testimony." The IJ therefore denied all relief.

## B

Shen appealed the IJ's order. In her brief to the BIA, she adhered to the view that she "went to the marriage registration office and was told that she must complete a pre-marital checkup," which was "routinely performed to

acquire a marriage license."  Shen generally challenged the
IJ's adverse credibility finding and, with respect to the
premarital check-up, Shen specifically disputed the IJ's
"demeanor-based" conclusion that, during the
Government's cross-examination, Shen was "stalling in
order to formulate a response."

The BIA upheld the IJ's order denying relief.  However,
in upholding the IJ's credibility determination, the BIA
expressly rejected some of the grounds upon which the IJ
had relied.  Specifically, the BIA held that Shen "was not
given an opportunity to explain" the inconsistency
concerning the year in which the forced abortion allegedly
occurred and was likewise "not given an opportunity to
explain the inconsistency the Immigration Judge perceived
between her testimony and declaration regarding her
response to being told by a clerk that she could not obtain a
license unless she had an abortion."  Accordingly, the BIA
concluded, these two grounds—which were the second and
fifth grounds provided by the IJ—"cannot support the
adverse credibility finding."  The BIA also declined to rely
on the IJ's conclusion that Shen's credibility was undercut
by the false statements in her visa application (which was the
first of the five grounds given by the IJ).  The BIA did not
find that this ground was improper; instead, it held that the
parties' dispute over this ground did not need to be resolved
because, under our (since-overruled) decisions in *Rizk v.
Holder*, 629 F.3d 1083 (9th Cir. 2011), and *Wang v. INS*, 352
F.3d 1250 (9th Cir. 2003), the IJ's "adverse credibility
determination" must be upheld "so long as even one basis is
supported by substantial evidence."  *Rizk*, 629 F.3d at 1088;
*but see Alam v. Garland*, 11 F.4th 1133, 1137 (9th Cir. 2021)
(en banc) (holding that, "[t]o the extent that our precedents
employed th[is] single factor rule . . . we overrule those

cases"). The BIA's upholding of the IJ's adverse credibility determination therefore rested solely on two of the five grounds articulated by the IJ.

First, the BIA held that the IJ properly "found that [Shen] gave inconsistent testimony regarding her pre-marital checkup." The BIA explained its reasoning on this score as follows (citations omitted):

> On direct examination, [Shen] testified that pre-marital checkups are routinely performed on both parties and that such checkups are required in order to acquire a marriage license. On cross-examination, the Department of Homeland Security ("DHS") confronted [Shen], asking whether the Chinese government discontinued requiring pre-marital checkups in 2003. She then changed her testimony and stated that pre-marital checkups were not required and she voluntarily went to her checkup. DHS counsel asked why she had previously testified that the pre-marital checkup was required in order to get a marriage license, and during this line of questioning, [Shen] began crying, took deep breaths and paused, and asked twice for the question to be repeated. She then admitted that she had "contradict[ed]" herself and stated she was nervous and the checkup occurred in 2003. The Immigration Judge found that [Shen] was likely stalling in order to formulate a response to DHS's question, and concluded that the inconsistency, along with [Shen's]

demeanor when confronted with it, undermined her credibility.

We are unpersuaded by [Shen's] argument that the negative demeanor finding is unsupported by the record. The Immigration Judge provided specific examples of how [Shen's] demeanor contributed to the adverse credibility finding, noting that [Shen] cried, took long pauses, and asked for the question to be repeated twice, and these findings are supported by the record. *See Kin v. Holder*, 595 F.3d 1050, 1056 (9th Cir. 2009) (acknowledging that Immigration Judge determinations regarding demeanor are given "special deference" and that the Immigration Judge "must still provide specific examples of a petitioner's demeanor that would support this basis for an adverse credibility determination").

Second, the BIA held that the IJ properly relied on the fact that the 2012 notarial certificate accompanying the copy of Shen's household register incorrectly stated that Shen had presented the register to the notary, which could not have been correct given that she has remained in the United States since 2011. The BIA concluded that, beyond generally defending the reliability and adequacy of her documentary evidence, Shen "did not make any specific arguments regarding this adverse credibility ground on appeal."

Having upheld the adverse credibility determination on these grounds, the BIA concluded that Shen's documentary evidence was insufficient to "overcome any credibility issues and satisfy her burden of proof." In particular, the

BIA held that, as it had already noted, there was "an inconsistency in the record regarding how the notarial certificate for the household registration was obtained in China, which undercuts the corroborative value of this document."

In light of the lack of credible testimony and the lack of documentary evidence that otherwise supported her claims, the BIA held that Shen had failed to carry her burden of proof with respect to her requests for asylum, statutory withholding of removal, and relief under the Convention Against Torture.

Shen timely petitioned for review in this court. We have jurisdiction under § 242 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1252. Because the BIA's decision to uphold the IJ's credibility determination rested on only two grounds, we consider only those specific grounds in reviewing the BIA's decision. *See Iman v. Barr*, 972 F.3d 1058, 1064–65 (9th Cir. 2020).

## II

We first consider the BIA's reliance on Shen's flustered response to DHS counsel's cross-examination confronting her with the assertion that "in 2003 the Chinese government did away with the requirement that couples present themselves for pre-marital checkups" and suggesting that she therefore had falsely claimed that her examination was mandatory. As we have explained, when confronted with DHS counsel's suggestion that the mandatory nature of the check-up had already been eliminated by the time of her examination in January 2003, Shen initially said that she did not "know whether what [DHS counsel] sa[id] is true." But when pressed further, Shen accepted DHS counsel's assertion, changed her testimony, and said that she went to

the check-up "voluntarily."   As the IJ noted, "when confronted with information *showing her statement was false*, [Shen] took a long pause before formulating a response, and asked for the question to be repeated twice" (emphasis added).  Shen ultimately stated that, now that "it ha[d] been brought to [her] attention [the] pre-marital checkup was done by a voluntary basis, not by force," she recognized that she must have "misspoke," and she attributed that error to the fact that the events occurred so long ago and that she was "quite nervous today."

At oral argument in this matter, the court inquired as to whether the record revealed exactly when the referenced change in Chinese law had taken effect and, if it did not, whether that constituted a question of foreign law as to which the court could take judicial notice.  The Government responded that the record was unclear as to that point and that the Government opposed any such judicial notice.  After argument, Shen's counsel submitted a citation to an August 19, 2003 article from the official *China Daily* newspaper announcing the elimination of the mandatory premarital health examination requirement and stating that this change in the law would take effect on "Oct. 1."  *China simplifies procedures for marriage, divorce*, CHINA DAILY (Aug. 19, 2003).[1]  The Government opposed Shen's submission of this article, arguing that it violated the statutory limitations on expansion of the administrative record and on consideration of unexhausted contentions.  We thereafter requested and received supplemental briefing from the parties concerning these points.

As we shall explain, we conclude that we may properly make an independent determination, as a question of foreign

---

[1] https://www.chinadaily.com.cn/en/doc/2003-08/19/content_256235.htm

law, that the relevant change in Chinese law took effect on October 1, 2003.  As a result, DHS counsel's suggestion, in cross-examination, that the change had already taken effect by the time of Shen's check-up in January 2003 rested on a clear misstatement of the applicable Chinese law.  And because that improper cross-examination may have had a substantial prejudicial effect on the agency's assessment of Shen's credibility, we grant Shen's petition and remand.

## A

The Government argues that, because the INA generally bars supplementation of the administrative record during judicial review, we cannot consider extra-record materials addressing the effective date of the repeal of the Chinese law requiring premarital medical examinations.  We disagree.

The judicial review provisions of the INA generally provide that, when an alien files a petition for review from a removal order, "the court of appeals shall decide the petition only on the administrative record on which the order of removal is based."  8 U.S.C. § 1252(b)(4)(A).  That means our review is generally limited to "the record of the pleadings, *evidence adduced*, and proceedings before the agency."  28 U.S.C. § 2347(a) (emphasis added); *see also* 8 U.S.C. § 1252(a)(1) (stating that, with the exception of § 2347(c), the judicial review provisions of Chapter 158 of Title 28 of the U.S. Code generally apply to petitions for review of removal orders).  Moreover, the INA specifically provides that, unlike in review of other agency matters, a court of appeals reviewing a removal order "may not order the taking of *additional evidence* [by the agency] under section 2347(c)" of Title 28 of the U.S. Code.  8 U.S.C. § 1252(a)(1) (emphasis added).

While the INA thus places strict limits on our ability to consider additional "evidence" that is not contained in the agency record, it does not similarly restrict our ability to conduct independent legal research concerning *any question of law* that properly arises in our consideration of a petition for review of a removal order. On the contrary—subject only to enumerated exceptions that are inapplicable here—the INA expressly preserves our authority to resolve any "question[] of law raised upon a petition for review." 8 U.S.C. § 1252(a)(2)(D). And, here, the issue of the effective date of the relevant Chinese law's repeal is a readily resolvable question of law, not a question of fact.

"At common law, the content of foreign law relevant to a dispute was treated as a question of fact." *See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 41 (2018) (simplified). However, treating foreign legal questions as factual issues "had a number of undesirable practical consequences." *Id*. at 42 (citation omitted). In particular, the parties were put to the burden of presenting foreign legal materials in conformity with the rules of evidence, and appellate courts were required to apply deferential standards in reviewing district court rulings on foreign law. *Id*. (citation omitted). This approach to foreign law was subsequently rejected with the simultaneous adoption, in 1966, of Federal Rule of Civil Procedure 44.1 and Federal Rule of Criminal Procedure 26.1. *Id*. at 42 & n.4. Under these rules, a court's "determination" of foreign law "must be treated as a ruling on a question of law," and the court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1; *see also* FED. R. CRIM. P. 26.1 ("Issues of foreign law are questions of law, but in deciding such issues

a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence."). Moreover, under these rules, a court's independent research into foreign legal questions "does not implicate the judicial notice and ex parte issues spawned by independent *factual* research undertaken by a court." *De Fontbrune v. Wofsy*, 838 F.3d 992, 999 (9th Cir. 2016) (emphasis added); *see also id*. at 997 (noting that the modern approach embodied in Rule 44.1 "eschews any requirement that the court formally take judicial notice of foreign law").

Although these rules do not by their terms apply in immigration proceedings or other agency matters, they reflect a now-prevailing generalized view that issues of foreign law should be treated as legal questions, and our precedent has therefore extended that same approach to the agency context, including specifically a petition for review under the INA. Thus, in addressing the petition for review in *Pazcoguin v. Radcliffe*, 292 F.3d 1209 (9th Cir. 2002), we expressly held that "[t]he determination of foreign law is a question of law" as to which we may "conduct[] our own research" and "reach [our] own decisions on the basis of independent examination of foreign legal authorities." *Id*. at 1216 (citing, *inter alia*, FED. R. CIV. P. 44.1).

Against this backdrop, we conclude that the effective date of the relevant change in Chinese law counts as a question of foreign law as to which we may conduct our own research in deciding Shen's petition for review under the INA. It is well settled in the context of domestic law that the determination of the effective date of any particular provision of law raises a *legal* question, and not a factual one. *See*, *e.g.*, *Mayers v. INS*, 175 F.3d 1289, 1302 (11th Cir. 1999) ("The question of a statute's effective date is generally considered to be a pure question of law for courts

to decide."); *Sandoval v. Reno*, 166 F.3d 225, 239–40 (3d Cir. 1999) ("[T]he question of a statute's effective date appears to present 'a pure question of statutory construction for the courts to decide.'" (citation omitted)); *Dallis v. Martin*, 929 F.2d 587, 589 (10th Cir. 1991) (holding that "the effective date of the particular Sentencing Reform Act section" at issue was "a question of law"). We can discern no logical reason why a different conclusion would apply in the context of foreign law. Accordingly, we hold that the effective date of the repeal of the Chinese law requiring a medical examination as a condition of a marriage license raises a question of foreign law as to which we may "conduct[] our own research." *Pazcoguin*, 292 F.3d at 1216. And we therefore reject, as inapposite, the Government's reliance on case authority holding that, in addressing a petition for review under the INA, we may not take "judicial notice" of *factual* material that is "not part of the administrative record." *See Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996) (en banc). That holding rests on the above-discussed rule that the INA precludes us from "consider[ing] *evidence* that is not part of the administrative record" or "conduct[ing] *factfinding* in the first instance." *Id*. (emphasis added and citations omitted). As we have explained, determining the effective date of a foreign law is a legal question that involves neither "factfinding" nor "judicial notice" of adjudicative facts.[2]

---

[2] The dissent likewise cites no authority that supports its view that the effective date of a foreign law raises a question of fact rather than a question of law. *See* Dissent at 37–38. Instead, it relies on inapposite cases that address, not the *de jure* content of foreign law (which is all that we address here), but the *de facto* real-world practices of foreign governments, sometimes in violation of the laws on their books. *See*,

Here, that legal question is readily resolved by consulting an authoritative Chinese source. Specifically, as Shen properly notes, the state-owned *China Daily* newspaper announced the abolition of the health examination requirement for marriage licenses in an August 19, 2003 article that expressly stated that the change would take effect on October 1, 2003. *See supra* at 16. It follows that, at Shen's hearing, the DHS attorney plainly misstated the content of Chinese law in his questioning of Shen.

The dissent contends that, in determining this issue of Chinese law, we are limited to considering only "legal authorities," such as "cases, statutes, regulations, treatises, scholarly articles, legislative history, treaties and other legal materials." *See* Dissent at 39 (citations omitted). But even under the Federal Rules, a court determining a question of foreign law may consult "*any* relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *See* FED.

---

*e.g.*, *B.R. v. Garland*, 26 F.4th 827, 845 (9th Cir. 2022) (addressing, not a question of foreign law, but whether, in practice, "the Mexican government would acquiesce in the torture of its citizens at the hands of cartels"); *Fisher*, 79 F.3d at 962 (distinguishing between the "mere existence of a law permitting the detention, arrest, or even imprisonment of a woman who does not wear the chador in Iran" and the actual enforcement of such a law "to inflict suffering *on account of* an individual's religious or political beliefs, race, nationality, or membership in a particular social group"); *Kamalyan v. Holder*, 620 F.3d 1054, 1056–57 (9th Cir. 2010) (noting that the petitioner acknowledged that "Jehovah's Witnesses could now legally proselytize" in Armenia, but that he also claimed that this law exists "only on paper" and that, in fact, "law enforcement still arrested Jehovah's Witnesses for proselytizing"). No party here has suggested that, to the extent that Shen was *required* to obtain a premarital medical examination in January 2003, that was the result of *extra-legal* governmental practices that necessitate relevant factfinding about such unlawful practices.

R. CIV. P. 44.1 (emphasis added).   That includes even a foreign government's "official statement," submitted for purposes of litigation, "on the meaning and interpretation of its domestic law."  *Animal Sci. Prods.*, 585 U.S. at 36; *see id*. at 46 (noting that, precisely because such a statement is *not* itself a binding legal determination, it "is ordinarily entitled to substantial but not conclusive weight").  If, as the Supreme Court has held, a foreign government's description of its law can be properly considered even when that statement was formulated specifically for litigation purposes, we discern no conceivable basis for concluding that we may not consider an official and unambiguous description of foreign law contained in a state-owned publication.

In any event, English translations of the actual texts of the relevant laws are readily available on Chinese government webpages, and they confirm the *China Daily* article's statement that the premarital medical check-up requirement was eliminated effective October 1, 2003.**[3]**  The dissent suggests that perhaps the Chinese government agencies that posted these English-language copies may have done an inadequate job of translating them, perhaps even intentionally, *see* Dissent at 38–40, but this utterly

---

[3] *See* Regulation on Marriage Registration, art. 22 (approved July 30, 2003) (stating that the "Regulation shall be put into force as of October 1, 2003" and that the "'Regulations on Control of Marriage Registration' approved by the State Council on January 12, 1994 and promulgated by the Ministry of Civil Affairs on February 1, 1994 shall be abolished simultaneously"), *available at* https://mzj.sh.gov.cn/MZ_zhuzhan902_ 0-2-896-897/20200519/MZ_zhuzhan902_24167.html;      *see     also* Regulations on Control of Marriage Registration, art. 9 (approved Jan. 12, 1994) (describing the requirement "for pre-marital health check-ups"), *available at* http://www.china.org.cn/living_in_china/abc/2009-06/24/content_18007155.htm.

groundless speculation provides no basis for doubting what multiple sources now reaffirm, which is that the relevant change in the premarital health check-up requirement took effect on October 1, 2003.  The dissent also complains that we should not consult a *regional* government website when it has published an English translation of a *national* regulation, *see* Dissent at 40, but neither law nor logic supports that contention.  As we have explained, even under the federal rules, "any relevant material or source" may be consulted in determining foreign law, *see* FED. R. CIV. P. 44.1, and if a regional government happens to be the one that has posted an English translation of a national law, we perceive no reasonable basis for closing our eyes to it.

Finally, in a flagrant and ironic violation of all the same principles the dissent (incorrectly) invokes against the majority, the dissent scours the details of the actual text of the regulations in order to raise additional points about the scope of the premarital check-up requirement that no party has ever raised either in the agency or this court.  These include whether the requirement, which the regulations reveal was regionally administered, was ever in effect in Chengdu, even before October 1, 2003, and whether, even after that date, a similar requirement might have remained applicable under some other law.**[4]**  *See* Dissent at 39–41.  But

---

[4] The Government has not contended—either before the agency or in this court—that the premarital check-up requirement that was eliminated in 2003 had never been implemented in Chengdu.  Nor has the Government ever argued that the requirement may have remained applicable under *another* law, which is the theory put forward by a Chinese law professor in a different *China Daily* article cited by the dissent.  *See* Dissent at 40–41.  This law professor's theory is the basis for the dissent's erroneous claim that this article "contradicts" the *China Daily* article cited by Shen in this court.  *See* Dissent at 40–41.  But there is no relevant

the only question of Chinese law properly before us is what was the effective date of the 2003 repeal of the premarital check-up requirement to which DHS counsel referred at Shen's hearing.  The answer to that question is quite clear— it was October 1, 2003.  The DHS attorney therefore clearly misstated the content of Chinese law in cross-examining Shen.

## B

The Government alternatively argues that, even if the question of the Chinese law's effective date is a legal one, we still may not consider it because Shen assertedly failed to exhaust the point before the agency.   We reject this contention.

Section § 242(d)(1) of the INA specifies that, before seeking judicial review, an alien must "exhaust[] all administrative remedies available to the alien as of right."  8 U.S.C. § 1252(d)(1).  Although we had long characterized that requirement as jurisdictional, *see Barron v. Ashcroft*, 358 F.3d 674, 678 (9th Cir. 2004), the Supreme Court

---

contradiction: the cited law professor did not deny that the new 2003 marriage regulations repealed the 1994 regulations (which contained a premarital check-up requirement) and replaced them with new rules that deleted that requirement.    *See* https://www.chinadaily.com.cn/en/doc/2003-09/04/content_261136.htm.    Indeed, the *China Daily* article cited by the dissent also explicitly references a statement from the Chinese Ministry of Health that "the new regulation has turned the mandatory pre-marital physical check-up into a voluntary action."  *Id*. In any event, a law professor's theory that the 2003 amended regulation might not actually have been sufficient to accomplish its goal of eliminating the premarital check-up requirement does not speak to the specific issue raised by DHS counsel at the hearing and is not properly before us.  And even if that law professor's theory is correct, it would just provide a second, cumulative reason why DHS counsel misstated Chinese law at Shen's hearing.

recently held that the INA's exhaustion requirement is a non-jurisdictional, but mandatory, claim-processing rule, *see Santos-Zacaria v. Garland*, 598 U.S. 411, 416–23 (2023). Because the Government here has properly raised the exhaustion requirement, we must address whether it bars us from considering the legal question of the Chinese law's effective date.

In describing what administrative exhaustion requires in the context of an appeal to the BIA, we have drawn a distinction between the basic "issues" raised by an alien in challenging an IJ's decision and the specific "arguments" that the alien raises in support of those issues. Thus, we have stated that, in appealing to the BIA, an alien "cannot satisfy the exhaustion requirement by making a general challenge to the IJ's decision, but, rather, must specify which *issues* form the basis of the appeal." *Zara v. Ashcroft*, 383 F.3d 927, 930 (9th Cir. 2004) (emphasis added). But we have also emphasized that an alien "need not, however, raise the *precise* argument below" that he or she now makes in a petition for review in this court. *Vizcarra-Ayala v. Mukasey*, 514 F.3d 870, 873 (9th Cir. 2008). This distinction dovetails with the familiar rule of appellate practice that an issue is adequately preserved for further review if the basic "claim" was raised below and that appellants "are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992). Here, as in the appellate context, there is no "clear-cut line between cases involving only an 'enlargement' of questions presented below and those involving entirely new questions." *Illinois v. Gates*, 462 U.S. 213, 220 (1983). But wherever that precise line may be, we have little difficulty concluding that the correct effective date of the Chinese law is a permissible sub-argument enlarging on an issue that was properly

exhausted before the agency.  *See Bare v. Barr*, 975 F.3d 952, 960 (9th Cir. 2020) (holding that, under the exhaustion requirement, a petitioner in this court "may raise a general argument in the administrative proceeding and then raise a more specific legal issue on appeal").

In Shen's brief to the BIA, she expressly objected to the IJ's negative demeanor finding and the overall adverse credibility determination.  Moreover, in describing the testimony that Shen contended the BIA should credit, Shen's brief reverted to her original position that she had been told by the marriage registration office that "she *must* complete a pre-marital checkup" before she could obtain a marriage license (emphasis added).  Although Shen's brief did not directly address why the BIA should accept that testimony over what she later said during DHS counsel's cross-examination, Shen explicitly argued that the IJ had erred in concluding that Shen's difficulty in answering DHS counsel's questions detracted from her credibility.  In particular, Shen asserted that the IJ's finding that she was likely "'stalling in order to formulate a response' [was] not supported by the record" and that the IJ had failed to "specifically and cogently refer to the non-credible aspects of the applicant's demeanor."  Because the brief thus clearly took the position that Shen should have been found credible in her contention that the premarital check-up requirement had been in effect when she had her check-up in January 2003, that was sufficient to "apprise" the BIA that she was contesting DHS's counsel's assertion that this requirement had already been repealed by then.  *See Rizo v. Lynch*, 810 F.3d 688, 692 (9th Cir. 2016).

Moreover, Shen's current arguments in this court raise only a pure question of law that is a permissible elaboration of issues raised before the agency.  *See*, *e.g.*, *Bare*, 975 F.3d

at 960–61, 963–64 (holding that, where alien concisely argued to the BIA that the IJ had failed to consider all of the factors required to determine whether his prior conviction was for a particularly serious crime, the alien could properly argue, in his petition for review in this court, that one of the factors was not met as a matter of law); *Moreno-Morante v. Gonzales*, 490 F.3d 1172, 1173 n.1 (9th Cir. 2007) (holding that, where alien had argued to the BIA that he had a "de facto parent-child relationship with his grandchildren," alien properly elaborated on this issue by arguing, in his petition for review, that his grandchildren met the statutory definition of "child" as a matter of law). Under these circumstances, Shen adequately exhausted her administrative remedies before filing her petition for review, and we may properly consider her current—meritorious—argument that, as a matter of Chinese law, the repeal of the premarital check-up requirement took effect on October 1, 2003.[5]

---

[5] The dissent also contends that, even if Shen preserved before the BIA the issue of whether a premarital check-up was required in January 2003, she failed to adequately raise the issue in her opening brief and instead argued the point only in a supplemental submission filed after the issue was raised at oral argument. *See* Dissent at 33. Even assuming *arguendo* that the dissent is correct on this point, it is well settled that this "rule of waiver is a discretionary one" and that we may proceed to consider an otherwise forfeited issue that is "purely one of law," particularly where "review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process." *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) (citation omitted); *see also United States v. Berger*, 473 F.3d 1080, 1100 n.5 (9th Cir. 2007). Here, as we have explained, the effective date of the repeal is purely a question of law. And given that DHS counsel—wittingly or unwittingly—misrepresented that legal point at Shen's hearing, the issue is one that implicates the integrity of these proceedings. We therefore exercise our discretion to consider it. And by resolving issues raised by the parties in their own post-argument

## C

In light of the foregoing, we conclude that DHS counsel clearly misstated the content of Chinese law in cross-examining Shen and that we may take that error into account in addressing Shen's petition for review.  That error, in turn, led the IJ to wrongly conclude that Shen became flustered after being "confronted with information showing her statement" about the premarital-examination requirement of Chinese law "was *false*" (emphasis added).  In short, this error vitiates the agency's given reasons for concluding that this cross-examination supported an adverse credibility determination.  *See Singh v. Ashcroft*, 393 F.3d 903, 907 (9th Cir. 2004) (holding that, where judicially noticeable information about the structure of a foreign government undermined the "centerpiece" of the agency's "adverse credibility finding," remand was warranted).

The Government argues that, even if this line of questioning is now viewed, in effect, as an inadvertent set of trick questions, we should nonetheless deny the petition on the ground that Shen's obvious floundering in responding to these questions still supports an adverse credibility determination.   This argument fails, because it would improperly uphold the agency's decision based on a modified rationale that the agency did not consider and that we have no authority to adopt.  *See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002).  Moreover, there are competing possible explanations for Shen's flustered reaction that

---

submissions—which then led us to request further supplemental briefing concerning the issues they raised—we do not violate the "principle of party presentation."  *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020).  Merely asking clarifying questions at oral argument is at most a "modest initiating role for a court" and is entirely "appropriate."  *Id*. at 376.

would not undermine her credibility: even the most honest of persons might understandably panic on the witness stand in thinking that she had made a *provable* mistake in recalling events from 12 years earlier, and she might therefore immediately change her testimony on the ground that her memory simply *must* have been faulty. Knowing now that DHS counsel misstated Chinese law, the agency, as the trier of fact, could reasonably come out either way as to the resulting effect on Shen's credibility. Accordingly, it is ultimately for the agency—not this court—to re-assess this issue.

The only remaining question is whether the BIA's *second* ground for upholding the adverse credibility determination is sufficient, by itself, to warrant our denying the petition. As noted earlier, that second ground involved a discrepancy between the date on the notarial certificate accompanying the copy of Shen's household register (which said that the register had been "presented" by Shen to the notary in China in February 2012) and the fact that Shen was concededly in the United States at that time. *See supra* at 10–11. When pressed on the point, Shen stated that her father had gone to the notary on her behalf, but the IJ rejected that explanation and the BIA upheld that determination. While, standing alone, this one factor *might* conceivably support an overall adverse credibility determination, we recently overruled our longstanding authority "requir[ing] us to sustain an adverse credibility finding if *one* of the agency's identified grounds is supported by substantial evidence." *Alam*, 11 F.4th at 1134 (simplified) (emphasis added). Instead, under *Alam*, "our review" of credibility determinations "will always require assessing the totality of the circumstances." *Id*. at 1137. Specifically, considering the record as a whole, we must assess whether any valid

"remaining factors—considered on their own—suffice to support an adverse credibility determination" with enough force to avoid the need for a remand. *Kumar v. Garland*, 18 F.4th 1148, 1156 (9th Cir. 2021). Applying these standards, we conclude that a remand to the agency is warranted here.

In reaching this conclusion, we emphasize two considerations. First, it seems likely that, in deciding whether to accept Shen's explanation for the discrepancy concerning the household register, a trier of fact would be affected by whether it thought Shen's credibility had been undermined by the very vigorous cross-examination over the premarital check-up issue. In that sense, this second ground cannot safely be said to be independent of the first.

Second, the household register had little direct significance to Shen's asylum claim. As the IJ expressly recognized, the household register merely "establish[ed] basic biographical information" and did not serve to "corroborate the persecution." This is not a circumstance, for example, in which the assertedly incorrect date listed on the household register could be said to support Shen's persecution claim by, say, confirming her presence in China at that time. On the contrary, Shen consistently maintained (and the Government does not dispute) that she has remained in the United States since 2011. She thus had nothing to gain, vis-à-vis her asylum application, from the fact that the notary certificate bore a 2012 date. While the discrepancy might nonetheless support a conclusion that the authenticity of the document was suspect, we have cautioned that "one suspect document is unlikely to constitute substantial evidence of adverse credibility on its own." *Dong v. Garland*, 50 F.4th 1291, 1300 (9th Cir. 2022). Considering the totality of the circumstances, we conclude that this factor

is insufficient, standing alone, to avoid a remand under *Alam*.

Accordingly, we conclude that the matter must be remanded to the agency so that it can reevaluate afresh its credibility determination and conduct any further proceedings.

**PETITION GRANTED AND REMANDED.**

---

MILLER, Circuit Judge, dissenting:

As this case comes before us, the dispositive issue is whether Shen testified credibly before the immigration judge. The Board of Immigration Appeals determined that she did not, pointing to her inconsistent testimony about a pre-marital medical exam in China. She first testified that the exam, which took place in January 2003, was mandatory: "You must get a pre-marital checkup before you can marry." Government counsel asked, "[I]sn't it true that in 2003 the Chinese government did away with the requirement that couples have to submit themselves to a pre-marital check up to obtain a marriage license?" After initially resisting the suggestion, Shen admitted that she had gone to the medical exam voluntarily. The immigration judge asked her to confirm whether it was "true that [the Chinese government] actually did away with [the] requirement," and she again conceded the point. She was then unable to explain the contradiction with her earlier testimony. Her inconsistency was a key reason that the immigration judge and the Board made an adverse credibility finding and, accordingly, denied relief.

Before this court, Shen admitted that she testified inconsistently but argued that "the inconsistency in relation to the requirement of a pre-marital checkup prior to one's registration of marriage is trivial in nature and does not constitute substantial evidence" supporting the adverse credibility finding. The government responded by pointing out that because the mandatory medical exam led to the discovery that Shen was pregnant, which in turn led to her forced abortion, this was not merely a trivial inconsistency but related to an important part of her claim. It was therefore a sufficient basis for the adverse credibility finding. *See Shrestha v. Holder*, 590 F.3d 1034, 1046–47 (9th Cir. 2010) ("Although inconsistencies no longer need to go to the heart of the petitioner's claim, when an inconsistency is at the heart of the claim it doubtless is of great weight.").

That should have been the end of the matter. An adverse credibility determination is a factual finding, and we must accept the agency's factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Garland v. Ming Dai*, 593 U.S. 357, 365 (2021). The arguments Shen has presented to us do not meet that standard.

Unfortunately, the court is not content to decide "the case shaped by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 380 (2020). Instead, at oral argument, the court asked the parties about a factual matter that was not raised before the Board, presented in the briefs, or reflected in the record: the specific date in 2003 on which the Chinese government repealed its pre-marital checkup policy. The following day, Shen provided the court with an article from the online version of *China Daily*, an English-language Chinese newspaper, suggesting that China did not lift the requirement of a pre-marital medical exam until October

2003. If true, that would mean that Shen's initial testimony was correct and that the government's cross-examination, which induced her to change her story, was based on an incorrect premise. The court issued a post-argument order asking the parties whether we could "take judicial notice of the date on which China changed its policy requiring individuals to undergo a pre-marital checkup."

We do not normally consider "issues which are not specifically and distinctly argued and raised in a party's opening brief," and this one was not. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). After all, "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.); *accord Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (explaining "the principle of party presentation," under which "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present"). In invoking the date of the Chinese policy change even though Shen did not raise it in her brief, the court disregards that important rule of restraint. But even setting aside that procedural irregularity, it is improper for us to rely on the *China Daily* article for two distinct reasons.

*First*, Shen did not exhaust any arguments based on the *China Daily* article before the immigration judge or the Board. Congress has provided that "[a] court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). That statute "permits us to consider only those issues that the petitioner properly raised before

the agency." *Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 894 (9th Cir. 2021), *overruled on other grounds by Santos-Zacaria v. Garland*, 598 U.S. 411 (2023); *see also United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."). Although the exhaustion requirement does not limit our jurisdiction, it is a mandatory rule that must be enforced when properly invoked, as it has been here. *Santos-Zacaria*, 598 U.S. at 416.

To be sure, the distinction between an "issue" (which must be exhausted) and a specific "argument" raised in support of the issue (which need not) can sometimes be difficult to identify. In drawing that line, we have looked to the purpose of the exhaustion requirement, which "is to give an administrative agency the opportunity to resolve a controversy or correct its own errors before judicial intervention." *Zara v. Ashcroft*, 383 F.3d 927, 931 (9th Cir. 2004), *abrogated in part on other grounds by Santos-Zacaria*, 598 U.S. at 411. What matters, then, is whether the agency could reasonably be expected to have addressed the issue. And an issue is exhausted when a petitioner raises it sufficiently "to put the BIA on notice that he [is] challenging the IJ's . . . determination, and the agency had an opportunity to pass on this issue." *Zhang v. Ashcroft*, 388 F.3d 713, 721 (9th Cir. 2004) (per curiam); *accord Figueroa v. Mukasey*, 543 F.3d 487, 492 (9th Cir. 2008) ("[W]e do not employ the exhaustion doctrine in a formalistic manner, but rather inquire into whether the issue was before the BIA such that it had the opportunity to correct its error.").

That principle makes this an easy case: Nothing Shen said before the Board would have alerted it to the change in the Chinese pre-marital checkup policy at issue in today's decision. In her brief to the Board, Shen mentioned the pre-marital checkup only twice. In the statement of facts, she summarized her testimony, including the testimony that she "went to the marriage registration office and was told that she must complete a pre-marital checkup." Then, in the argument section, she addressed the immigration judge's negative demeanor finding, stating: "In regard to the IJ's demeanor finding, the IJ found that [Shen] was likely 'stalling' in order to formulate a response regarding questioning as to her pre-marital checkup." She argued that "the IJ's presumption that it was 'likely that [she] was stalling in order to formulate a response' is not supported by the record" and suggested that the immigration judge had failed to "specifically and cogently refer to the non-credible aspects of [her] demeanor."

Crucially, Shen never argued that the immigration judge was wrong to think that she had testified falsely about whether the medical exam was mandatory, nor did she argue that the government's questioning was misleading. Her general attack on the adverse credibility finding is not enough to preserve that issue. As we recently explained in *Gonzalez-Castillo v. Garland*, "[t]his is not a case in which the petitioner described the substance of the argument in [her] brief without using the correct legalese, which would suffice for purposes of exhaustion." 47 F.4th 971, 980 (9th Cir. 2022). "Pointing to 'the entirety' of the testimony"— which is essentially what Shen did in attacking the immigration judge's demeanor finding—"does not . . . put the BIA on notice as to the specific issues so that the BIA has an opportunity to pass on those issues." *Id.* at 981

(internal quotation marks and citation omitted). Nothing in Shen's brief would have alerted the Board that it should begin to peruse Chinese newspapers. Because the issue has not been exhausted, we may not consider it.

*Second*, the *China Daily* article is not part of the administrative record. Congress has directed that "the court of appeals shall decide the petition only on the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A). That statute codifies the bedrock administrative-law principle that judicial review of agency action is based on the record that was before the agency. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). It requires "that petitioners present all outside documents, reports, or information during the course of the administrative proceedings and not offer them for the first time before this court." *Lising v. INS*, 124 F.3d 996, 998 (9th Cir. 1997).

Shen argues that "the date [on] which the Chinese government changed its pre-marital checkup policy is a judicially noticeable adjudicative fact," but that is incorrect. (capitalization omitted). We may take judicial notice of "out-of-record evidence only where (1) the Board considers the evidence; or (2) the Board abuses its discretion by failing to consider such evidence upon the motion of an applicant." *Fisher v. INS*, 79 F.3d 955, 964 (9th Cir. 1996) (en banc). Neither scenario is presented here, and the court does not suggest otherwise.

Instead, the court says that the date of China's policy change is a question of foreign law, and because "[t]he determination of foreign law is a question of law," we need not confine ourselves to the administrative record in answering it. *Pazcoguin v. Radcliffe*, 292 F.3d 1209, 1216

(9th Cir. 2002), *as amended*, 308 F.3d 934 (9th Cir. 2002). Here the court goes one step beyond invoking an argument that Shen did not present; it contradicts the argument she *did* present, which, as noted, was that the date of the policy change was a "judicially noticeable adjudicative *fact*." (capitalization omitted; emphasis added). Shen's characterization was correct. As it relates to this case, the date of the policy change presents a question of fact, not law.

China's policy changes are relevant, if at all, only to the extent that they help us evaluate Shen's credibility by answering the question, "When Shen got married in Chengdu in January 2003, was she compelled to undergo a medical exam?" Fundamentally, that is a question about the circumstances that Shen confronted in China, and answering it requires assessing not only China's official policy in January 2003 but also the real-world practices of the Chinese government at that time. *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1072 (9th Cir. 2017) (en banc) ("[I]t is well recognized that a country's laws are not always reflective of actual country conditions."). To put it in the terms commonly used in immigration law, it is a question of country conditions. And we have unequivocally held that country conditions present a factual question, which is why we refuse to consider even the State Department's official human rights reports in cases where they have not been made part of the record. *See*, *e.g.*, *Fisher*, 79 F.3d at 964; *Marcu v. INS*, 147 F.3d 1078, 1082 (9th Cir. 1998).

To be sure, one can conceptualize any requirement imposed by a foreign government as "law" in the sense of a general command issued by a sovereign and backed by a sanction. *See* John Austin, *The Province of Jurisprudence Determined* 5–19 (1832); *but see* H.L.A. Hart, *The Concept of Law* 18–78 (2d ed. 1961). Thus, one might consider the

existence or nonexistence of such a requirement—like the requirement to undergo a pre-marital medical exam—to be a question of law. But on that theory, a question like "Does the Iranian government discriminate against women in employment?" becomes a question of Iranian law. *But see Fisher*, 79 F.3d at 964 (declining to consider extra-record evidence in answering that question). Likewise, "Does the Mexican government acquiesce in torture by drug cartels?" would be a question of Mexican law. *But see B.R. v. Garland*, 26 F.4th 827, 845 (9th Cir. 2022) (treating the question as factual and reviewing the Board's answer for substantial evidence). And "Does the Armenian government impose a ban on proselytizing by Jehovah's Witnesses?" would be a question of Armenian law. *But see Kamalyan v. Holder*, 620 F.3d 1054, 1056–57 (9th Cir. 2010) (same). Until today, we have not taken that approach, nor has any other court. Those are bread-and-butter factual determinations about country conditions that the Board routinely makes—and that we routinely review for substantial evidence—based on the agency record, not our own "legal" research.

Even if one fully embraces the Austinian theory of law as command, and even if one indulges the dubious assumption that such a theory of law is relevant in assessing the distinction between questions of law and questions of fact in our review of Board decisions, there remains another problem: The court's "legal" research does not demonstrate that Shen was compelled to undergo a pre-marital medical exam in January 2003.

The court focuses on an article in the "state-owned" *China Daily*, which the court describes as "an authoritative Chinese source." A casual reader of today's decision might be forgiven for thinking that *China Daily* is essentially the

*Federal Register* with Chinese characteristics. It is not. It is a general-interest English-language periodical, not an official source of Chinese statutes, regulations, or judicial decisions, which are written in Mandarin. When we are called upon to ascertain foreign law, we do so "on the basis of independent examination of foreign *legal authorities*." *Pazcouguin*, 292 F.3d at 1216 (emphasis added) (quoting *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 713 (5th Cir. 1999)); *see de Fontbrune v. Wofsy*, 838 F.3d 992, 999 (9th Cir. 2016) (explaining that "courts look to cases, statutes, regulations, treatises, scholarly articles, legislative history, treaties and other legal materials" to ascertain foreign law). *China Daily* is not a foreign legal authority; at best, it merely describes Chinese law. And descriptions of legal rules in newspapers are not always entirely accurate—not even in the People's Republic of China.

According to the court, the description in the *China Daily* article is buttressed by the "actual texts" of China's 1994 marriage-registration regulation, which set out a pre-marital exam policy, and the 2003 marriage regulation, which allegedly repealed the policy. As a threshold matter, it is unclear whether the two citations that the court provides indeed contain the texts of the 1994 regulation and its 2003 amendment. First, the court cites another state-run news website that has seemingly reprinted and translated the 1994 regulation from the original Mandarin. We are ill-equipped to evaluate the accuracy of the translation, but setting that aside, the State Department cautions that Chinese state-owned media outlets are not reliable sources of information. *See* U.S. Department of State, Global Engagement Center, *How the People's Republic of China Seeks to Reshape the Global Information Environment* 10 (2023) (describing

Chinese state-owned media as part of "a worldwide investment strategy to . . . maximize the distribution of false or biased pro-[People's Republic of China] content to global audiences"). Second, the court cites the Shanghai Civil Affairs Bureau website, which offers a reprinted and translated version of the 2003 regulation. Shanghai is more than 1000 miles from Chengdu, so this is somewhat akin to citing a Florida government website to establish the content of federal regulations applicable to someone in Vermont.

In any event, even if the cited websites indeed contain the texts of the relevant regulations, the regulations do not establish that a pre-marital checkup requirement existed in Chengdu before 2003 or that such a policy was abolished at some point in 2003. In fact, the plain text of the cited 1994 regulation suggests that pre-marital exams were *not* a national requirement but rather a regional practice. *See Regulations on Control of Marriage Registration*, China.org.cn, http://www.china.org.cn/living_in_china/abc/ 2009-06/24/content_18007155.htm (last visited July 12, 2024) ("*In places practising* pre-marital health check-ups, parties applying for marriage registration must go to the designated medical care institution for pre-marital health check-ups . . . . Areas to be decided to practise pre-marital health check-ups shall be proposed by . . . [the] people's governments in provinces, autonomous regions and municipalities." (emphasis added)).

As for the cited 2003 regulation, it does not reference pre-marital medical exams at all, and a *China Daily* article from 2003—published less than three weeks after the article the court cites—states that "[t]he so-called cancellation of the check-ups is a kind of misunderstanding of the newly enacted regulation on marriage registration" because "[t]he regulation does not stipulate whether . . . couples should

undergo physical check-ups before marriage registration" and "the absence of a clear stipulation in the regulation does not mean the check-ups will be cancelled." *Couples encouraged to get check-ups*, China Daily (Sept. 4, 2003), https://www.chinadaily.com.cn/en/doc/2003-09/04/ content_261136.htm. That contradicts the *China Daily* article on which the court principally relies, which asserted that "[t]he new regulation says that people may take a health examination before marriage, but will not be forced to do so." *China simplifies procedures for marriage, divorce*, China Daily (Aug. 19, 2003), https://www.chinadaily. com.cn/en/doc/2003-08/19/content_256235.htm. The court derides the later article as reflecting merely "a law professor's theory," suggesting that in just a few weeks, *China Daily* somehow went from being an "authoritative Chinese source" to a forum for dubious academic speculation. Be that as it may, I have no way of knowing which article is correct, but at least one of them must be wrong. And neither these articles nor the other materials unearthed by the court resolve the question of whether Chengdu required pre-marital medical exams as a matter of either law or custom in January 2003 such that Shen was forced to undergo such an exam.

The court responds to these observations by complaining that it is improper for me to read "the actual text of the regulations" and to raise points "that no party has ever raised either in the agency or this court." The objection is baffling. Of course no party presented arguments based on the text of the regulations or articles in *China Daily*, which is why, as I have already explained, we should not consider any of those extra-record materials in the first place. But the court has chosen to assess Shen's credibility before the immigration judge—the only issue the parties *did* present to us—by

turning to Google and reviewing various Chinese websites that purportedly describe the relevant regulations. It is fair to respond by pointing out that the regulations do not support the court's theory.

To be clear, I do not question that the materials cited by the court could be relevant evidence of country conditions. (Their persuasive weight is a different question.) But to be considered as such, they should have been presented to the agency and made part of the administrative record so that the Board could have evaluated them alongside other evidence. Because they were not, it is improper for the court to consider them.

*          *          *

My criticism of the court's decision should not be mistaken for an endorsement of the government's conduct in this case. If the court is correct about conditions in Chengdu in 2003, then it appears that the government tricked Shen into believing that she had been caught in a lie, when in fact she was telling the truth. There is no evidence that this trickery was deliberate, rather than a product of the government's carelessness, but it is nevertheless greatly to the discredit of government counsel. And it is therefore understandable that the court wishes to find some way to spare Shen from removal.

Understandable, perhaps, but not legally defensible. We are not an ombudsman for the Department of Homeland Security, nor are we charged with a general superintendence of the Attorney General's removal decisions. Rather, our role is limited to performing the traditional functions of a reviewing court: We consider the contentions properly presented to us by a petitioner and exhausted before the agency, and we evaluate those contentions based on the

record compiled by the agency. Because we are not authorized to do more, I would deny the petition for review.